

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. PD-0921-06

**MARK ANTHONY RAMOS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### IN CAUSE NO. 04-04-00784-CR FROM THE FOURTH COURT OF APPEALS
### BEXAR COUNTY

**HOLCOMB, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., join. MEYERS, J., dissents without opinion.**

The trial court denied appellant's motion to suppress and admitted his written statement in evidence over his objection that it had been obtained in violation of his Fifth Amendment right to remain silent. The court of appeals upheld the trial court's ruling and its judgment of conviction. We reverse and remand.

On February 11, 2004, a Bexar County grand jury returned an indictment charging appellant with the murder of Tracy Ortiz under Texas Penal Code § 19.02(b)(1)-(3). Appellant later filed a

pretrial motion to suppress a written statement that he had given to police shortly after he had been taken into custody. In that motion, which consisted entirely of boilerplate with no specifics, appellant alleged that his statement had been the product of custodial interrogation and that it was inadmissible in court because, among other things: (1) it had been given after he had invoked his Fifth Amendment right to remain silent and (2) it had been the fruit of an "illegal seizure."

On July 19, 2004, the trial court held an evidentiary hearing on appellant's motion to suppress. At that hearing, the State called two witnesses (Troy Ragland and Tim Angell) and appellant called two witnesses (Becky Muniz and Mary Muniz). Troy Ragland testified that: (1) he was a police officer in the San Antonio Police Department; (2) on November 19-20, 2003, he assisted Detective John Slaughter in the investigation of a drive-by shooting that had occurred on Delgado Street in San Antonio; (3) in the course of the investigation, Slaughter directed him to locate appellant, who was known to be a member of a street gang; (4) during his efforts to locate appellant, he received information that appellant might be residing with his sister, Becky Muniz; (5) pursuant to that information, he and several other police officers went to Becky Muniz's residence shortly before 1:00 a.m. on November 20, 2003; (6) upon their arrival, they searched the residence, with Becky Muniz's permission, but they did not find appellant; (7) the other police officers then left, but he remained behind in the hope that appellant might soon arrive; (8) about thirty minutes later, appellant did arrive at the Muniz residence; (9) he asked appellant to go to the downtown police station to answer some questions "about an incident that [had] happened on Delgado," and appellant voluntarily agreed to do so; (10) he then handcuffed appellant, put him in the back of a patrol car that he had summoned by radio, and had him transported to the downtown police station; and (11) upon appellant's arrival at the downtown police station, police officers removed his handcuffs and placed

him in an interview room.

Tim Angell testified that: (1) he was a detective in the San Antonio Police Department; (2) during the early morning hours of November 20, 2003, Detective John Slaughter asked him to question appellant about a recent drive-by shooting; (3) Slaughter informed him at that time that appellant "was possibly the shooter"; (4) he questioned appellant in an interview room; (5) he and appellant were alone in that room; (6) Slaughter was, at that same time, questioning appellant's girlfriend, Camelle Gallegos, in a separate room; (7) before he questioned appellant, he told him that he was not under arrest; (8) he also explained appellant's *Miranda* rights[1] to him, and appellant indicated that he understood those rights; (9) he then asked appellant whether he would answer some questions concerning a drive-by shooting, and appellant said that he would; (10) during the first part of the questioning, appellant "denied any involvement in [the drive-by shooting] or knowledge about it," and provided an alibi; (11) after about 45 minutes, he (i.e., Angell) left the interview room to speak again with Slaughter; and (12) "[Slaughter then] advised [him] that Camelle Gallegos, whom he was interviewing and taking [a] statement from, indicated that she was in the vehicle [involved in the drive-by shooting] and that Mr. Ramos was the person that shot the weapon." Angell's testimony continued:

Q: Once you talked to Detective Slaughter, what did you do?

A: I went back in [the interview room] and spoke to Mr. Ramos and told him that Camelle Gallegos had indicated that he was the shooter, to see what he would say.

Q: What did he say?

A: He laughed at me and said that she would never say that.

---

[1] *See* discussion *infra*.

Q: So he didn't deny the shooting?

A: No.

Q: He just said she would never say that?

A: That's correct.

Q: Did you continue talking to him then about Camelle Gallegos? Or how did the interview go after that?

A: Yes, I continued to talk to him. And told him that with the information that Detective Slaughter had, he would probably be able to get an arrest warrant.

Q: Okay.

A: Mr. Ramos got upset with me.

Q: What did he say?

A: He told me that he didn't want to talk to me. That he didn't want to talk about it anymore.

Q: Didn't want to talk about it anymore?

A: Correct.

Q: And what did you do?

A: I told him that was fine. He didn't have to. I got up and left the interview room.

Q: Did you go back into the interview room later?

A: Yes, I did.

Q: How much later?

A: Probably five minutes. I just left the interview room briefly to use the restroom.

Q: Was there ever a point where Detective Slaughter went into the room?

A: When we went back – when I went back into the interview room, Detective Slaughter went back in there with me. Either right about that time or just a few

seconds later.

Q: Did you talk to Mark Ramos again?

A: I was present. Detective Slaughter informed Mr. Ramos, verified that Camelle had indicated that he was the shooter. And told him that, you know, it would probably be better if he told us what really happened.

* * *

Q: Did [appellant] continue talking to you?

A: Yes, he did.

Q: And what did he say?

A: He asked me what was going to happen to Camelle. If she was going to be arrested.

Q: And what happened next?

A: I told him that I didn't know, that wasn't my decision. It would be up to Detective Slaughter.

Q: Okay. What happened after that?

A: At that point, Mr. Ramos said that she didn't have anything to do with it.

Q: How did you take that at that time?

A: I took it as an admission that he had been there. And that he was telling me that we shouldn't arrest her, because she didn't do anything. She had nothing to do with it.

Q: And when he said that, that he said that she didn't have anything to do with it, what step did you take after that?

A: I asked him if he was the person who fired the weapon?

Q: And what did he say?

A: He said he was.

Q: And what happened next?

A: At that point, I stopped and read him his [*Miranda*] rights a second time.

* * *

Q: Now, after reading his [*Miranda* rights a second time], what happened next?

A: I opened up a statement form, a voluntary statement form from the computer, and took [appellant's] statement.

* * *

Q: Okay. Now, throughout the course of this interrogation of Mr. Ramos, you said at one time you decided to take a break?

A: That's correct.

Q: And you went outside [the interview room], and Detective Slaughter had told you that Camelle had implicated Mr. Ramos?

A: That's correct.

Q: And then you went back inside to talk to him about that. And at that time, Mr. Ramos said that he didn't want to talk about it anymore?

A: That's correct.

Q: Okay. So at that point in time, he has terminated the interrogation, correct? He has told you he is not talking about it anymore?

A: He hadn't terminated the interrogation. He told me that he didn't want to talk about it anymore.

Q: Okay. If – to you, what would you consider to be a sufficient termination of the interrogation other than "I don't want to talk about it anymore"? What more specifically could he have said to you that would have made you believe that he was ending the interview?

A: "I don't want to talk to you until I have a lawyer." "I want to leave." That would have worked.

Q: So if he uses the magic words "lawyer" or "leave," it's over, but if he says, "I

don't want to talk about it anymore," it's not over as far as you're concerned?

A: That's correct.

* * *

Q: You said that Mr. Ramos had said that he didn't want to talk to you, correct?

A: Correct.

Q: He had ended the interview?

A: Said he didn't want to talk to me.

Q: Okay. The interview is over?

A: Not necessarily.

Q: Okay. So he just said that he didn't want to talk to you, right?

A: Yes.

Q: Okay. But in your mind you are still going. The interview is still going on even though he said he didn't want to talk to you anymore, correct?

A: People say that to us all of the time.

* * *

Q: And the topic right before he said, "I don't want to talk about that anymore," was his girlfriend Camelle Gallegos talking to Detective Slaughter; is that right?

A: Yes, that's correct.

Q: From the way you understood it, was, was that your understanding of it? Was that "I don't want to talk about if Camelle is giving me up in the other room"?

A: That's correct.

* * *

Q: So when he says, "I don't want to talk about that anymore," could he have been talking about Camelle being in the other office giving up the fact that he is the

shooter?

A: That's possible, yeah. I didn't know what he meant by "I don't want to talk about it anymore" or "I don't want to talk about that anymore."

Becky Muniz testified that: (1) she was appellant's sister; (2) on the night of November 20, 2003, five or six San Antonio police officers came to her residence looking for appellant; (3) she consented to their search of her residence, but they did not find appellant there; (4) all of the officers but one then left; (5) the officer who stayed behind was Officer Ragland; (6) about an hour later, appellant arrived at the residence; (7) when appellant arrived, Ragland "told him to come in and sit down" and then asked him to give his name; (8) when appellant told Ragland his name, Ragland "told him to stand up and turn around, and he handcuffed him [behind his back]"; (9) Ragland then informed appellant that "he was going down for questioning"; and (10) Ragland put appellant in a patrol car for transport.

Finally, Mary Muniz testified that: (1) she was appellant's mother; and (2) on November 20, 2003, she learned that the San Antonio Police wanted appellant for questioning.

At the close of the evidence at the suppression hearing, the trial court asked the State and the defense to present their arguments. The State argued that: (1) "there is a factual dispute, obviously, about the circumstances that happened at [appellant's] sister's house"; (2) "our contention is that all of [appellant's] statements, both oral statements beforehand [i.e., before appellant gave his written statement] and this [written] statement, all were given when [appellant] was clearly told that he was not in custody and that he knew that"; and (3) appellant never unambiguously invoked his Fifth Amendment right to remain silent.

Defense counsel responded that: (1) with respect to the circumstances surrounding

appellant's trip to the downtown police station on the night in question, "the court has to [decide] whether [to] believe Officer Ragland or believe [appellant's] sister"; (2) at the moment Ragland handcuffed appellant, a reasonable person in appellant's situation would have believed himself to be in custody; and (3) "the court should suppress [appellant's written] statement" because it was obtained following custodial interrogation during which the police failed to honor appellant's "unequivocal" request "to terminate the interview."

After both sides concluded their arguments, the trial court denied appellant's motion to suppress. The trial court explained that, although "the defendant was in custody,"[2] his statement to Angell that he no longer wanted to talk "was ambiguous enough that the officer was not obliged under the case law to stop questioning."

On October 25, 2004, the State brought appellant to trial before a petit jury on his plea of not guilty. In the course of the guilt stage of the trial, appellant's written statement was admitted in evidence as State's Exhibit Number 98. After hearing all of the evidence at the guilt stage, the jury found appellant guilty of murder as charged in the indictment. Later, after hearing additional evidence at the punishment stage, the jury assessed appellant's punishment at imprisonment for 99 years.

---

[2] The trial court, in its ruling on appellant's motion to suppress, did not specify at which point in time appellant had been taken into custody by the San Antonio police. However, given the evidence and arguments before the trial court at the time it ruled, we conclude it was implicit in the trial court's ruling that appellant had *already* been taken into custody at the moment he had told Angell that he no longer wanted to talk to him. The court of appeals, after reviewing the record, seems to have reached the same conclusion. The first sentence of the court of appeals's opinion reads: "Approximately four days after Tracy Ortiz was killed in a drive-by shooting, Ramos was taken into custody because police suspected he was the person responsible for her death." The record reflects that the San Antonio police "suspected [Ramos] was the person responsible for [Ortiz's] death" long before Ramos told Angell that he no longer wanted to talk to him.

On direct appeal, appellant brought two points of error. In his first point of error, appellant, citing *Miranda v. Arizona*, 384 U.S. 436, 473-474 (1966), and *Michigan v. Mosley*, 423 U.S. 96, 103-104 (1975), argued that "[t]he trial court erred by [denying his motion to suppress and] admitting [his written] statement in evidence, because the statement was obtained after police began questioning [him] again after he had asserted his [Fifth Amendment] right to remain silent." Appellant's argument continued:

> "It is hard to imagine how much more explicit Appellant could have been in this situation than to say, 'I don't want to talk to you. I don't want to talk about it anymore.' Detective Angell would have required Appellant actually to leave to terminate the interrogation. But Appellant couldn't do that. He was in custody. So he was trapped in an interview room with a police officer who would not stop questioning him even after Appellant had said he didn't want to talk any more."

In his second point of error, appellant, citing *Farmah v. State*, 883 S.W.2d 674, 679 (Tex.Crim.App. 1994), argued that "[t]he trial court erred by admitting [his written] statement in evidence because it was the result of custodial interrogation following an illegal, warrantless arrest." Appellant's argument continued: "Appellant's arrest [by Officer Ragland] was made without probable cause and without a warrant. It was presumptively illegal. The State put on no evidence to prove the legality of the arrest."

In response to appellant's first point of error, the State argued that "[t]here is no evidence that Appellant unambiguously asserted his right to silence." "In the instant case," the State continued, "everything about appellant's behavior of cooperation [provided] a reasonable basis for the officer to infer that Appellant simply did not want to talk about his girlfriend [and what she was telling the police], not that he did not want to talk at all." Notably, the State did not bring a cross-point challenging the trial court's determination that appellant had been taken into custody by the San

Antonio police. *See* Tex. Code Crim. Proc. art. 44.01(c). In response to appellant's second point of error, the State argued that, "[b]ecause Appellant failed to argue this issue to the trial court [either] at the hearing on the motion to suppress or at trial, error, if any, was waived."

In an unpublished opinion, a panel of the Fourth Court of Appeals, with one justice concurring in the result, overruled appellant's two points of error and affirmed the judgment of the trial court. *Ramos v. State*, No. 04-04-00784-CR (Tex.App.–San Antonio 2006). With respect to appellant's first point of error, the panel majority, citing *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex.Crim.App. 1996), explained its decision as follows:

> "In context, Ramos's statement to Angell that he no longer wanted to talk to him about 'it' is open to interpretation. For example, because Ramos's statement immediately followed Angell's comment that the information Gallegos was providing Detective Slaughter was likely sufficient to obtain an arrest warrant, the statement could reasonably be understood as Ramos's refusal to talk about the idea that he might be arrested. Likewise, because Ramos's statement also immediately followed Angell's comment that Gallegos had identified Ramos as the shooter, the statement could reasonably be understood as Ramos's refusal to talk about Gallegos's role in identifying him as the shooter. Similarly, because Ramos had spent the previous forty-five minutes denying his involvement in the drive-by shooting, his statement to Angell could also reasonably be understood as his refusal to talk about that subject any further. A reasonable officer in Angell's position could have interpreted Ramos's statements in numerous ways and not solely as an unmistakable and unequivocal insistence on terminating the interview. Because Ramos failed to articulate a desire to cut off questioning with sufficient clarity to invoke his constitutional right to remain silent, we hold the trial court did not abuse its discretion in denying the motion to suppress." *Ramos v. State*, No. 04-04-00784-CR, slip op. at 4.

With respect to appellant's second point of error, the panel majority, citing Texas Rule of Appellate Procedure 33.1, explained its decision as follows:

> "Although Ramos included an assertion in his written motion [to suppress] that he was illegally seized, he did not argue to the trial court, either at the hearing on the motion to suppress or at trial, that his [written] statement was inadmissible because it was the 'fruit' of an illegal arrest. Accordingly, he has waived his complaint."

*Ramos v. State*, No. 04-04-00784-CR, slip op. at 5.

The concurring justice, after reviewing the circumstances of appellant's interrogation, stated:

> "I believe those circumstances indicate Ramos unambiguously indicated he desired to invoke his right to 'cut off questioning.' Ramos spoke freely with Angell until Angell stated Slaughter had enough information to obtain an arrest warrant. Up to that point in time, Angell and Ramos were discussing the shooting, Ramos's alleged alibi, and Gallegos's statement to Slaughter. The focus of the interrogation was the shooting; therefore, Ramos's statement that he did not "want to talk about it" encompassed the only reason for the interrogation, which was the shooting." *Id*. (Marion, J., concurring), slip op. at 2.

The concurring justice also concluded that the San Antonio police had not "scrupulously honored" appellant's unambiguous invocation of his right to remain silent and that, therefore, the trial court had erred in admitting appellant's written statement in evidence. *Id*. at 4. Finally, the concurring justice concluded that the trial court's error had been harmless beyond a reasonable doubt. *Id*. at 6.

Appellant later filed a petition for discretionary review asserting three grounds for review, two of which we granted. *See* Tex. R. App. Proc. 66.3(e). In his brief to this Court, appellant, citing *Hearne v. State*, 534 S.W.2d 703 (Tex.Crim.App. 1976), argues first that the court of appeals erred in upholding the trial court's denial of his motion to suppress and its admission of his written statement in evidence (ground for review number one). Appellant argues second that "[t]he court of appeals erred in holding that [his] claim of illegal arrest, made in his written motion to suppress evidence and ruled on by the trial court, was waived when not argued orally to the trial court" (ground for review number two).

In its reply to appellant's first ground for review, the State argues that the record evidence supports the trial court's ruling that appellant did not unambiguously assert his right to remain

silent.[3] In its reply to appellant's second ground, the State argues that "[g]eneral complaints made in a motion to suppress, standing alone, are insufficient to preserve error, and matters not argued at the suppression hearing cannot be raised on appeal."

Our analysis begins with appellant's first ground for review. As we have often explained, a trial court's ruling admitting or excluding evidence is reviewed on appeal for abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex.Crim.App. 2006). In other words, the trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ibid.*

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This guarantee was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). Consistent with this Fifth Amendment guarantee, law enforcement officials, before questioning[4] a person in custody, must inform him that he has the right to remain silent and that any statement he makes may be used against him in court. *Dickerson v. United States*, 530 U.S. 428, 438-439 (2000); *Miranda v. Arizona*, 384 U.S. at 444. "If the individual [in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the

---

[3] The State also argues that "Appellant was not in custody at the time he made the oral statements [to Angell, and,] therefore, *Miranda* and its progeny do not apply." As we noted previously, however, the State did not bring a cross-point in the court of appeals challenging the trial court's determination that appellant had been taken into custody by the San Antonio police. Nor did the court of appeals consider any such argument *sua sponte*. Nor did we grant review in order to consider any such argument.

[4] "Questioning," in this context, "refers not only to express questioning, but also to any other words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

interrogation must cease." *Miranda v. Arizona*, 384 U.S. at 473-474. "As this language [in *Miranda*] suggests, the suspect need not use any particular phraseology to invoke the right [to remain silent]." G. Dix & R. Dawson, 41 *Texas Practice: Criminal Practice and Procedure* § 13.261 (2d ed. 2001). "[A]ny declaration of a desire to terminate the contact or inquiry . . . should suffice. The same is true of silence in the face of repeated questioning, or an effort to end the contact with the interrogator." W. LaFave, et al., *Criminal Procedure* § 6.9(f) at 853 (3d ed. 2007) (footnotes omitted). "But, an [interrogating] officer need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks." *Dowthitt v. State*, 931 S.W.2d at 257. If a person in custody does invoke his Fifth Amendment right to remain silent, then the admissibility in court of statements obtained thereafter depends on whether the person's right was "scrupulously honored." *Michigan v. Mosley*, 423 U.S. at 104.

In *Hearne v. State*, 534 S.W.2d 703, the principal case upon which appellant now relies, Charles Edward Hearne was taken into custody by Dallas police, *Mirandized*, and then interrogated about a then-recent murder. At the start of the interrogation, Hearne told the interrogating officer that he did not want to talk to him. The interrogating officer, however, continued talking to Hearne for another half-hour and persuaded him to answer questions about the murder. Hearne ultimately confessed to the officer, and Hearne's confession, reduced to writing, was admitted in evidence at his trial over his objection. We reversed Hearne's conviction, holding that his written confession should have been suppressed, because he "had made it known [to the interrogating officer] that he wished to remain silent" and his decision to remain silent had not been scrupulously honored. *Id*. at 707.

In the instant case, the State's own evidence at the suppression hearing established that

appellant, in the course of Angell's questioning of him, told Angell that he did not want to talk to him. Appellant's statement to Angell that he did not want to talk to him was an unambiguous, unequivocal, and unqualified assertion of his right to remain silent. *Ibid*. A reasonable police officer in Angell's position would not have found appellant's assertion of his right to be ambiguous. Any ambiguity in appellant's other statement to Angell, that he did not want to talk about "it" anymore, was, in context, entirely irrelevant. Thus, the record does not reasonably support the trial court's ruling that appellant did not unambiguously assert his right to remain silent, and the court of appeals erred in holding otherwise.

The next question is whether the San Antonio police scrupulously honored appellant's assertion of his right to remain silent. The State's own evidence at the suppression hearing established that after appellant invoked his right to remain silent, Angell, along with Slaughter, re-approached him after only five minutes. Slaughter then confirmed to appellant Angell's prior statement that Gallegos had identified appellant as the shooter in the drive-by shooting. Immediately thereafter, Slaughter told appellant that "it would probably be better if he told [them] what really happened."[5] A minute or two after that, just before appellant gave his written statement to Angell, Angell *Mirandized* him again.

These undisputed facts establish that those officers did not scrupulously honor appellant's assertion of his Fifth Amendment right to remain silent. "[T]he 'scrupulously honored' test is not met where the police . . . resumed questioning after a short interval during which custody continued." W. LaFave, et al., *Criminal Procedure* § 6.9(f) at 839-840 (footnote omitted). *Accord, Charles v.*

---

[5] Slaughter's statements to appellant clearly amounted to "questioning," since they were obviously intended to elicit an incriminating response.

*Smith*, 894 F.2d 718, 726 (5th Cir. 1990). Nor can police negate a person's invocation of his right to remain silent simply by repeating the *Miranda* warnings. *Accord*, *United States v. Taylor*, 164 F.3d 150, 155 (3rd Cir. 1998).

Because the police officers did not scrupulously honor appellant's invocation of his right to remain silent, his subsequent written statement was inadmissible at his trial. *Michigan v. Mosley*, 423 U.S. at 104. Consequently, the trial court abused its discretion in denying appellant's motion to suppress and in admitting his written statement in evidence at his trial, and the court of appeals erred in holding otherwise. We sustain appellant's first ground for review. Having sustained appellant's first ground for review, we dismiss his second ground.

We reverse the judgment of the court of appeals and remand the case to that court for a harm analysis under Texas Rule of Appellate Procedure 44.2(a). *See Clay v. State*, ___S.W.3d___, No. PD-1370-05 (Tex.Crim.App.–Nov. 21, 2007) (discussing the constitutional harmless error rule).

DELIVERED: FEBRUARY 6, 2008

PUBLISH