TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00703-CR






Jesse Williams, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT


NO. 3021005, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING 






O P I N I O N



 A jury found appellant Jesse Williams guilty of intentionally causing serious bodily
injury to a child and assessed his punishment at life in prison and a $10,000 fine. See Tex. Penal
Code Ann. § 22.04(a)(1), (e) (West Supp. 2007). In two issues on appeal, appellant contends that
the trial court erred by overruling his motion to suppress two videotaped statements he made to the
police. Finding no reversible error, we affirm the trial court's judgment.


BACKGROUND


The Events

 On May 14, 2002, firefighters responded to a 911 call placed by appellant asking
them to come to the aid of an unconscious child. The firefighters found appellant and his mother
standing on a street corner. The woman was holding an unconscious infant, later identified as two-and-a-half-year-old D.B., the son of appellant's girlfriend, Eugenie Rochelle Bradshaw. When the
firefighters arrived, D.B. was limp and unresponsive to stimuli, including pain. It was immediately
apparent to them that something was seriously wrong with the child neurologically. They also
saw both recent and older scabs on the boy's chest and what appeared to be deep scratches all
over his body.

 The firefighters asked appellant what had happened to the child. Appellant said that
"this is probably going to be my fault." His mother asked, "What did you do?" Appellant said that
D.B. had had a bowel movement in his pants and so he punished him. As the firefighters worked
to revive the child, appellant, who smelled strongly of alcohol, "stood around" looking nervous.

 Appellant was also questioned at the scene by Police Officer Carlos Vallejo. (1) 
Appellant told Vallejo that D.B. had been disobedient, so he grabbed him by the arm and spanked
him three or four times using the palm of his right hand. Appellant told the officer that D.B. had
broken into a "cold sweat" and that he thought he might have given D.B. a "rude awakening."

 As the EMS technicians were putting D.B. into the ambulance, his body began
"posturing," an indication that his brain was starting to swell. At the hospital, doctors discovered
bleeding and swelling throughout the child's brain and indications that he had been violently shaken. 
He had suffered renal failure. His buttocks were badly bruised and swollen from being beaten with
some sort of blunt object. It appeared that the child had been beaten, shaken, and then "left for
dead." D.B. survived, but he is disabled for life.



The Interviews


 The following day, May 15, Detective Robert Merrill interviewed appellant in
an interview room at the police station. Appellant was brought to the station in handcuffs, but
he was not cuffed or restrained during the interview. (2) At the beginning of the interview, Merrill
advised appellant of his Miranda rights, and appellant said that he understood. See Miranda
v. Arizona, 384 U.S. 436 (1966). The interview continued as follows:


Q. Do you have any questions about those rights?


A. I want to terminate everything right now.


Q. You want to terminate . . .


A. You're telling me that I'm under arrest.


Q. No, you're not.


A. (Inaudible).


Q. They--they cuffed you up.


A. Yes, they did. They claim I was being detained.


Q. Right. And I'm gonna protect me and you. Now, you know your rights. 
You--you don't have to talk to me if you don't want to.


A. That's the only reason why I came down here was to comply with--with
whatever his name was, the other detective.


Q. Detective Faithful?


A. Uh-huh.


Q. Okay. We would like to have an idea so we can tell the doctor what
happened, give him an idea of how to treat your boy, but that's your decision
to make. You said you want to terminate it. Do you want to terminate or do
you want to talk to me?


A. No, I want to help to comply--to help--to help my son, uhh--


Q. To help your son?


A. Yes, I do.



 Without further hesitation, appellant began to answer Merrill's questions. Appellant
talked about the days before the 911 call in great detail, describing how he had cared for D.B., where
he went with him, what D.B. did and ate, D.B.'s general health, and who else cared for him. 
Appellant also described some of his disciplinary measures, including a brief spanking on the night
of the 911 call, after which D.B. fell and hit his head on the floor. Appellant said that he spanked
D.B. no more than once per day. Often, he would put D.B. in a particular position with his hands
on the ground or have him stand in the corner with his hands up for time out, instead of spanking
him. Appellant denied pushing D.B. or doing anything that could cause a brain injury. Appellant
admitted having about three beers on the night he called 911. He said he was not drunk and had not
smoked any marihuana. Appellant emphasized that D.B. had suffered numerous falls: backwards
onto the floor, off of the front porch steps, at the gym, in the bathtub, and from a swing.

 Appellant was allowed to leave the police station after the May 15 interview, and
a police officer gave him a ride to the hospital. Appellant was arrested for injury to a child
with serious bodily injury two days later, on May 17. After his arrest, he was interviewed by Merrill
a second time. He was again advised of his rights and agreed to waive those rights. In this May 17
interview, appellant initially stated that he used only periodic spankings and time-outs in certain
positions to discipline the child. As the interview continued, appellant admitted shaking D.B. on two
separate occasions, once on the night of the 911 phone call and once a week before that call. He said
that when he shook D.B., the child's head swung all the way back and all the way forward. 
Appellant said that he knew he "went overboard" but that he was not trying to injure D.B., only to
rear him properly.

 On May 18, appellant called the police station from jail wanting to speak to Merrill. 
Merrill returned appellant's call and, without appellant's knowledge, recorded the conversation. 
Appellant told Merrill that on the night the boy was injured, he "may have went a little bit
overboard." He explained that he had been smoking marihuana that may have been laced with PCP
and may have consumed three or more beers.


The Pretrial Hearing


 Following a hearing, the trial court overruled appellant's motion to suppress the
videotapes and transcripts of the May 15 and May 17 interviews. With respect to the May 15
interview, the court determined that appellant's statement that he wanted to "terminate everything
right now," considered in the context of the total conversation and appellant's demeanor as shown
on the videotape, did not amount to an unambiguous assertion of his right to terminate the interview. 
The court said:


The court finds that after reading all of the transcript and watching the video
that the defendant did not unambiguously assert his right to terminate the interview,
and I made this determination by considering the conversation between the defendant
and the Detective Merrill . . . . And it's clear to this court that the defendant was
attempting to clarify what Detective Merrill meant and that was, he was trying to
clarify whether he was in custody . . . .


Also considering the entire conversation, it's clear that Detective Merrill
never uses coercion or tries to--he tries to clarify for the defendant to see if he is
actually terminating everything. He's trying to clarify whether he's in custody. And
you have to take in the totality of the conversation and also the tape and the demeanor
of the witnesses.


I do understand that just on its face from what the defendant says, "I want to
terminate everything," it seems like it's clear. However, if you look at the entire
interaction between the two, it's clear that the defendant was confused and that
Detective Merrill was trying to clarify and get an unambiguous statement from the
defendant about what he wanted to do.



The court concluded that the May 15 statement was the product of custodial interrogation, but that
appellant had been properly advised of his rights and had voluntarily waived those rights and spoken
to the detective in full compliance with article 38.22. See Tex. Code Crim. Proc. Ann. art. 38.22
(West 2005).

 The court also found that the May 17 statement was made during custodial
interrogation, but again concluded that appellant knowingly waived his rights and gave the statement
voluntarily. The court did suppress large portions of appellant's May 18 telephone conversation with
Merrill, finding that the statements were in response to interrogation and that appellant had not been
advised of his Miranda rights that day. The court ruled that the statement about the PCP-laced
marihuana was admissible, however, because it was made spontaneously and not in response to
questions by the officer. (3)


The Trial

 The jury heard the police and medical testimony summarized above. Consistent with
the trial court's ruling, the jury also saw and heard appellant's May 15 and May 17 statements, and
heard the admissible portions of the May 18 telephone call.

 D.B.'s mother, Eugenie Rochelle Bradshaw, testified that she had known appellant
for several years, and that they had had an "off-and-on relationship." In January 2002, appellant
moved into the apartment that Bradshaw and D.B. shared with one of her relatives. During this time,
appellant cared for D.B. while Bradshaw worked. Around May 1, Bradshaw and D.B. left the
apartment and moved in with a friend, while appellant moved in with his mother. Appellant
continued to care for D.B. In fact, D.B. was essentially living with appellant and his mother, and
Bradshaw would visit with him for an hour or so every other day. Bradshaw testified that appellant
was responsible for feeding, dressing, and bathing D.B. She said that prior to May 14, she never saw
appellant impose any excessive physical discipline, and that she did not observe any physical or
cognitive injuries to D.B. prior to May 14.

 Appellant testified in his own defense. He said that he was not an experienced parent
and that he disciplined D.B. by spanking him approximately once a day. He also made D.B. stand
in a corner with his hands up or forced him to stand in a "V" position with his hands on the floor. 
He twice disciplined D.B. by shaking him. Appellant said he did not know that shaking a child could
cause serious bodily harm and that he would not have done so had he known. He recounted several
accidental injuries to D.B.'s head, including falls from a swing, a step, in a bathtub, at the gym, and
against the couch.

 On cross-examination, appellant testified that he was upset on the night he called 911
because D.B. had a dirty diaper, refused to bring appellant a candy bar, and refused to go to bed. He
admitted spanking the boy repeatedly on top of his swollen, bruised bottom and demonstrated how
he shook the boy for 30 to 45 seconds. Appellant acknowledged that he shook D.B. until the child
became unconscious and started gasping for air.

 Throughout his testimony, appellant insisted that he did not intentionally or
knowingly injure D.B. Appellant told the jury, "I admit I made a mistake. . . . And the only thing
I can honestly say is, I apologize to the mother for trying to rear him the best way I can. I had limited
knowledge. I'm not the smartest person in the world. . . I did my best."

 In his closing argument, appellant's counsel did not seek to persuade the jury that
appellant had not injured D.B. Instead, he stressed that appellant had not intended to injure the child
and did not know that his actions would cause such injury.


This is what he's culpable and responsible for. Accepting care of a child, an
infant child when he shouldn't have, when he wasn't a parent, when he'd never done
any babysitting, when he had never done any parent training.


. . .


He had so little experience that when the child exhibited cognitive or motor
deficits, he didn't even recognize them. Doesn't even--it's below knowing. He
doesn't even know. He's doesn't know, in the words of government's lawyers, until
it's almost too late. And then it took the intervention of his mother to say, what on
earth has happened? How could this be? He says, I don't know. I'm just doing the
best I can.


Remember, he didn't say, I intended to hurt the child, or I knew I was going
to hurt the child. He said, I did the best I can, and I made a mistake and I caused
accidents.


. . .


We also believe that there are certain physical acts, occurrences and events
that contributed to the injuries. We clearly believe falling contributed. We clearly
believe being ejected from a swing contributed. We clearly believe slipping in the
bathtub contributed. Falling on the bleachers contributed. All of these acts and
occurrences contributed. Shaking, spanking. We agree to all of that. It's self-evident and obvious. No doubt about it.


But then the question then occurs, during the course of the spank or the shake
or the push or the pull, was it your conscious objective and desire, was it your intent
to cause the result? When you--when you do the swat, is it your conscious intent
and desire to cause these kinds of injuries, or are you aware that this--or this is going
to cause these kinds of injuries? We think the answer is simple.


And we think you'd best refer to Detective Merrill and Jesse Williams
himself. Both say accident, mistake. I didn't think you meant to do it. I didn't mean
to do it. I confess a mistake.



DISCUSSION


 In his first issue on appeal, appellant contends that his Fifth Amendment rights were
violated on May 15 when Merrill continued to question him after he attempted to terminate
the interview. In his second issue, appellant asserts that the unlawful May 15 interview tainted the
interview on May 17. He urges that the trial court erred by admitting the two statements.


Standard of Review


 An appellate court should afford almost total deference to a trial court's determination
of the historical facts that the record supports, especially when the trial court's fact findings are based
on an evaluation of credibility and demeanor. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App.
1997); Hollingsworth v. State, 15 S.W.3d 586, 591 (Tex. App.--Austin 2000, no pet.). Appellate
courts should give the same amount of deference to a trial court's rulings on "application of law to
fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate
questions turns on an evaluation of credibility and demeanor. Guzman, 955 S.W.2d at 89; Hargrove
v. State, 162 S.W.3d 313, 318 (Tex. App.--Fort Worth 2005, pet. ref'd). Appellate courts review
de novo "mixed questions of law and fact" not falling within this category. Guzman, 955 S.W.2d
at 89; Hargrove, 162 S.W.3d at 318. At the hearing on a motion to suppress, the trial court is the
sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. 
Ramirez, 44 S.W.3d at 109. The trial judge may choose to believe or disbelieve any or all of a
witness's testimony. Id.


Right to Terminate Questioning


 The right to terminate questioning is among the procedural safeguards that Miranda
establishes. Miranda, 384 U.S. at 474. This right, which safeguards the Fifth Amendment right to
remain silent, requires the police to immediately cease custodial interrogation when a suspect
"indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." 
Ramos v. State, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting Miranda, 384 U.S. at 473-74). There is no talismanic word or phrase with which to invoke the right to remain silent. Watson
v. State, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). Any declaration of a desire to terminate the
contact or inquiry should suffice. Ramos, 245 S.W.3d at 418. The suspect need not object to further
questioning in order to protect the right to remain silent. Watson, 762 S.W.2d at 599.

 The threshold question is whether the suspect invoked his right to silence. Ramirez
v. State, 44 S.W.3d 107, 110 (Tex. App.--Austin 2001, no pet.). An interrogating officer need not
stop his questioning unless the suspect's invocation of rights is unambiguous. Ramos, 245 S.W.3d
at 418; Dowthitt v. State, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). A police officer does not
violate a suspect's right to remain silent when he attempts to clarify whether the suspect wishes to
remain silent, and the suspect may thereafter choose to continue to speak about the offense. Hopkins
v. Cockrell, 325 F.3d 579, 583 (5th Cir. 2003); Barnes v. Johnson, 160 F.3d 218, 224-25 (5th Cir.
1998) (officer did not violate defendant's right to silence when he attempted to clarify whether
defendant wished to invoke right with "a few explanatory, noncoercive questions," and defendant
chose to keep talking). In determining whether the right to remain silent was unambiguously
invoked, courts look to the totality of the circumstances. Watson, 762 S.W.2d at 597. Ambiguity
exists when the suspect's statement is subject to more than one reasonable interpretation under the
circumstances. See Douthitt, 931 S.W.2d at 257 (holding that suspect's statement, "I can't say more
than that. I need to rest," was ambiguous and indicated only that suspect believed that he was
physically unable to continue); Franks v. State, 90 S.W.3d 771, 787 (Tex. App.--Fort Worth 2002,
pet. ref'd, untimely filed) (suspect's statement that he was tired and did not want to talk anymore was
ambiguous and merely indicated that suspect was physically unable to continue).


The May 15 Statement

 In Hargrove, the suspect was being questioned when he said, "Let's just terminate
it." 162 S.W.3d at 319. The interrogating officer asked, "Do you want to stop now?" and the
suspect replied, "Why should we go on because I'll be spinning my wheels. You're spinning your
wheels." Id. However, the suspect never answered the officer's question about whether he wanted
to stop, continued speaking without clarifying his remark, and never again asked to end the
interview. Id. The court held that the suspect's "terminate it" comment was ambiguous and that his
rights were not violated by the continuation of the interrogation. Id. at 319-20.

 The videotape of appellant's May 15 interview shows that appellant was left alone
in the interrogation room after being brought to the station. After a period of silence, he began
railing against the police in a long string of obscenities and said, "Least you all can talk to me or let
me go, arrest me or something. . . . Talk to somebody." Merrill reentered the room and appellant
said, "I'm trying to see if I'm getting talked to or what. Yeah, I'm trying to see how my boy's doing. 
You guys need to talk to me, arrest me or whatever . . . ." (Emphasis added.) Merrill asked appellant
for his name and inquired how he was doing. Appellant complained about having been in handcuffs
but said that he was fine. Merrill then advised appellant of his rights and asked if he had any
questions. As noted previously, appellant responded "I want to terminate everything right now." 
When Merrill asked appellant to confirm that he "want[ed] to terminate," appellant interrupted to
say, "You're telling me that I'm under arrest." At this point, it was reasonable for the officer to
believe that appellant's main concern was that he was under arrest. After a brief discussion of
appellant's arrest status, Merrill said, "Now you know your rights. You--you don't have to talk to
me if you don't want to." When appellant said that he came to the police station to "comply with"
the other detective, Merrill repeated that it was up to appellant and again asked if appellant wanted
to terminate the interview. Appellant said he wanted to help his son and the interview continued. 
The officer did not threaten, badger, or coerce appellant. Appellant displayed no reluctance to
answer the officer's questions.

 When appellant told Merrill that he wanted to "terminate everything," the officer did
not simply ignore the statement and continue questioning. Instead, the officer sought to clarify
appellant's wishes before continuing the interview. See Marshall v. State, 210 S.W.3d 618, 628
(Tex. Crim. App. 2006) (federal constitutional law does not prohibit officer from clarifying whether
arrestee wished to waive right to remain silent). After viewing the videotape, we agree with the
trial court's conclusion that appellant's statement that he wanted to "terminate everything," when
considered in the context in which it was made--which includes appellant's statement moments
earlier that "[y]ou guys need to talk to me, arrest me or whatever"--did not constitute an
unambiguous invocation of the right to silence. Rather, appellant appeared frustrated by his
detention and was attempting to determine whether he had been arrested. Giving due deference
to the fact finder's credibility determinations, we conclude that the court did not abuse its discretion
by overruling the motion to suppress and admitting the May 15 interview into evidence. (4) See
Ramirez, 44 S.W.3d at 109.

 The concurring opinion argues that it is inappropriate to consider the context in which
appellant's statement was made, urging that such an approach is contrary to the holding in Ramos. 
In Ramos, the suspect told the interrogating officer that "he didn't want to talk to [the officer]. That
he didn't want to talk about it anymore." 245 S.W.3d at 413. The court of criminal appeals held:

[Ramos's] statement to [the officer] that he did not want to talk to him was an
unambiguous, unequivocal, and unqualified assertion of the right to remain silent. 
A reasonable police officer in [the officer's] position would not have found
[Ramos's] assertion of his right to be ambiguous. Any ambiguity in [Ramos's] other
statement to [the officer], that he did not want to talk about "it" anymore, was, in
context, entirely irrelevant.



Id. at 418-19 (citation omitted and emphasis added). Contrary to the argument in the concurring
opinion, the court of criminal appeals in Ramos considered the context in which the critical
statements were made. What distinguishes Ramos from this case is that Ramos's statement, "I don't
want to talk to you," is clearer and less ambiguous than appellant's statement, "I want to terminate
everything right now." We do not believe that Ramos prohibits the trial court or this Court from
considering the context in order to ascertain appellant's meaning.

 We further conclude, for reasons we will discuss below, that if appellant's statement
that he wanted to "terminate everything right now" was under the circumstances an unambiguous
request to remain silent, and if Merrill failed to scrupulously honor that request by continuing to
question appellant, and if the trial court erred by admitting the May 15 videotaped interview into
evidence, the error was harmless. In order to explain this alternative holding, we must first discuss
appellant's challenge to the admission of the May 17 videotaped interview.


The May 17 Statement


 In his second issue, appellant contends that his May 17 statement to the police was
erroneously admitted because it was "tainted" by the May 15 statement. It is unclear from his brief
whether appellant is asserting that: (1) because he invoked his right to remain silent on May 15, the
police could not interview him on May 17, or (2) the May 17 statement was the tainted fruit of the
inadmissible May 15 statement.

 Appellant relies primarily on the holding in Michigan v. Mosley, 423 U.S. 96 (1975). 
Mosley was arrested in connection with a series of robberies, taken to a police interrogation room,
and advised of his Miranda rights. Id. at 97. After Mosley said that he did not want to answer any
questions about the robberies, the arresting officer immediately ended the interrogation, and Mosley
was taken to a jail cell. Id. More than two hours later, Mosley was taken from his cell to another
interrogation room, where a different officer advised him of his rights and began to question him
about a homicide unrelated to the offenses for which he had been arrested. Id. at 98. Mosley did not
invoke his right to remain silent, did not ask for counsel, and gave a statement implicating himself
in the homicide. Id. It was undisputed that the later interrogation fully complied with Miranda
procedures when considered alone, but Mosley urged that it was impermissible for the second officer
to question him about the homicide after he had told the first officer that he did not want to talk
about the robberies. Id. at 98-99.

 The Mosley Court rejected any reading of Miranda under which a person who has
invoked his right to silence can never again be subjected to custodial interrogation. Id. at 101-02. 
Instead, the admissibility of statements obtained after a person in custody has decided to remain
silent depends on whether the right to cut off questioning was scrupulously honored. Id. at 104. The
Court concluded that Mosley's right to cut off questioning had been fully respected: "[T]he police
here immediately ceased the [first] interrogation, resumed questioning only after the passage of a
significant period of time and the provision of a fresh set of warnings, and restricted the second
interrogation to a crime that had not been a subject of the earlier interrogation." Id. at 106. Under
Mosley, courts must evaluate the facts of each case to determine if the resumption of police
interrogation was consistent with scrupulous observance of the right to cut off questioning. Maestas
v. State, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999).

 For the purposes of our discussion of appellant's second issue, we will assume that
Merrill failed to scrupulously honor appellant's right to remain silent by continuing to question
him on May 15 after appellant said he wanted to "terminate everything." We do not believe,
however, that Mosley compels the conclusion that Merrill was precluded from approaching appellant
on May 17 and obtaining an admissible statement. After the May 15 interview ended, appellant was
released from custody and allowed to go home. Appellant remained at large for two days, until he
was arrested for this offense on May 17. Before interviewing appellant on May 17, Merrill advised
him of his rights and appellant voluntarily waived those rights. Considered alone, the May 17
interview fully complied with Miranda procedures. In light of the two-day period during which
appellant was not in custody, we hold that appellant's invocation of the right to silence on May 15
did not carry over to the May 17 interview so as to render invalid appellant's waiver of the right to
silence on the latter date.

 Making a confession under circumstances that preclude its use does not perpetually
disable the confessor from making a usable one after those circumstances have been removed. 
Griffin v. State, 765 S.W.2d 422, 428 (Tex. Crim. App. 1989) (quoting United States v. Bayer,
331 U.S. 532, 541 (1947)). It has never been held that the psychological impact of the voluntary
disclosure of a guilty secret qualifies as State compulsion or compromises the voluntariness of a
subsequent informed waiver of the right to remain silent. Id. at 429 (quoting Oregon v. Elstad,
470 U.S. 298, 312 (1985)). When a person voluntarily makes an inculpatory statement under
circumstances that render it inadmissible under Miranda, the dictates of Miranda and the goals of
the Fifth Amendment are fully satisfied by barring the use of the statement. Elstad, 470 U.S. at 318. 
No further purpose is served by imputing "taint" to a subsequent statement obtained pursuant to a
voluntary and knowing waiver of the person's Miranda rights. Id.

 The trial court found that appellant's May 15 and May 17 statements were given
voluntarily, and appellant does not dispute this. As we have already noted, the May 17 statement
was taken in full conformity to Miranda's dictates. We hold that even if the May 15 statement was
inadmissible because appellant had invoked his right to remain silent, it did not taint the May 17
statement or otherwise render the May 17 statement inadmissible.


Harmless Error

 We now turn to the question of whether, assuming the trial court erred by admitting
the May 15 statement into evidence, the error was reversibly harmful. We conclude that it was not.

 Appellant's trial testimony largely replicated the statements he made during the May
15 interview. Although appellant testified that the child accidentally fell and hit his head on a
number of occasions, appellant did not deny striking and shaking D.B. during the days immediately
preceding the emergency call. In fact, appellant admitted that on May 14, he had shaken D.B. until
the child became unconscious and started gasping for air. Appellant's defense was not that he did
not injure D.B., but that he did not intentionally or knowingly injure the child.

 It cannot be persuasively argued that, but for the admission of the May 15 statement,
appellant would have chosen a different defensive strategy. Even if the May 15 statement had not
been admitted in evidence, the jury would have heard the testimony that when emergency workers
found appellant with the child on May 14, he told them "this is probably going to be my fault." 
Appellant also said at the scene that he had grabbed D.B. and spanked him, and that this might have
been a "rude awakening." The jury would also have heard appellant's May 17 videotaped statement,
which was properly admitted in evidence. During this interview, appellant admitted that he twice
shook D.B., once on the night of the emergency, that the child's head swung back and forth when
he shook him, and that he knew that he "went overboard." The jury would also have heard portions
of appellant's May 18 telephone call to Merrill, during which appellant admitted that he went
"overboard" when he disciplined D.B. and that he had been smoking PCP-laced marihuana. Under
the circumstances, it is likely that appellant's trial strategy would have been the same even if the
court had suppressed the May 15 statement.

 In short, there was considerable evidence of appellant's guilt even without the May
15 statement. See Motilla v. State, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002) (evidence of
defendant's guilt is factor to consider in harm analysis). In light of the record as a whole, we
conclude beyond a reasonable doubt that the admission of the May 15 statement, if error, did not
contribute to the conviction or the punishment. See Tex. R. App. P. 44.2(a).





CONCLUSION


 For all the reasons stated, we hold that the trial court did not err, or did not reversibly
err, by admitting into evidence appellant's May 15 and May 17 statements. We overrule issues one
and two, and we affirm the judgment of conviction.



 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear;

 Concurring Opinion by Justice Puryear


Affirmed


Filed: June 6, 2008


Publish
1. Appellant does not question the admissibility of his statements to Vallejo.
2. The State initially stipulated at the pretrial hearing that appellant was in custody. The State later
argued that appellant was not in custody because the handcuffs were removed and appellant was told
that he was not under arrest.
3. Appellant does not challenge the court's ruling regarding the telephone conversation.
4. See Milburn v. State, No. 03-02-00458-CR, 2004 Tex. App. LEXIS 1057, at *12-14
(Tex. App.--Austin Feb. 5, 2004, pet. ref'd) (mem. op.) (not designated for publication) (cited for
illustrative purposes only) (suspect said "I don't have nothing to say," officer responded by repeating
suspect's statement in the form of a question; officer's action was not calculated to elicit
an incriminating response; suspect's subsequent admission manifested a desire to continue the
conversation and did not unambiguously invoke the right to silence).