

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LUKE STANTON, | § | No. 08-12-00294-CR |
| Appellant | § | Appeal from the |
| v. | § | 211th District Court |
| THE STATE OF TEXAS, | § | of Denton County, Texas |
| Appellee. | § | (TC# F-2011-1912-C) |
| | § | |

## **O P I N I O N**

Luke Stanton is appealing his convictions of continuous sexual abuse of a young child (Count I) and indecency with a child (Counts II - IV), enhanced by a prior felony conviction. A jury found Appellant guilty, found the enhancement paragraph true, and assessed his punishment at imprisonment for forty years on Count I and fifteen years on Counts II, III, and IV. The trial court included in the judgment an order that the sentences shall run consecutively. We affirm.

### **FACTUAL SUMMARY**

A jury found Appellant guilty of multiple sex-based offenses committed against K.B., R.B., and A.A. in three cases tried together: cause numbers F-2011-1911-C (Counts I - IV committed against K.B.)(cause number 08-12-00293-CR), F-2011-1912-C (Counts I - IV committed against R.B.)(cause number 08-12-00294-CR), and cause number F-2011-1913-C

involving a single offense committed against A.A. (cause number 08-12-00295-CR). This appeal concerns only the continuous sexual abuse of a child and indecency with a child convictions related to R.B. Appellant has not challenged the sufficiency of the evidence supporting his convictions and the issues presented on appeal are related to the exclusion of evidence that he passed a polygraph. We will summarize the evidence related to all three cases in order to place the issues raised on appeal in context.

R.B. and K.B. were Appellant's stepdaughters at the time these offenses were committed. R.B., who was sixteen years of age when this case was tried in August 2012, testified that Appellant touched her vagina "almost daily" both before and after she turned fourteen years of age. The first incident occurred when she was 10 or 11 years of age. Appellant rubbed ointment on mosquito bites on her legs and he gradually moved his hand until he was touching her vagina over her clothes. R.B. reported the incident to her mother, K.S., and K.S. replied that she would talk to Appellant. When K.S. asked Appellant about R.B.'s statement, Appellant denied any wrongdoing. Appellant continued to assault R.B. by touching her genitals both on top of and under her clothing on many other occasions. She explained that he often began by rubbing her feet and legs, but he eventually moved his hand so that he was touching her vagina. R.B. also testified that Appellant touched and squeezed her breast with his hand. R.B. told her mother what Appellant was doing to her, but K.S. did not believe her.

K.B. was twenty years old at the time of trial. K.B. testified that when she was in the fourth grade, Appellant came into her bedroom at night, reached under the covers, and squeezed her vagina with his hand. K.B. kicked him and pulled away from him. Appellant then left the room. On another occasion when K.B. was about to enter the fifth grade, she and R.B. were having a water gun fight in the pool. Appellant was also in the pool and he got behind K.B. and

pulled her onto his lap. Appellant moved K.B.'s hands under the water and made her touch his penis. He also moved her swimsuit bottom and tried to penetrate her with his penis. She tried to pull away because it hurt but he would not let go of her. K.B. did not cry out because she did not want to scare R.B. who was only five or six years of age at the time. Appellant finally let her go and she got out of the pool. In another incident, Appellant pulled down K.B.'s pants and underwear and touched her genitals with his mouth and tongue. K.B. tried to kick him and get away but he held her down. K.B. testified that Appellant continued to touch her genitals with his hands and mouth on many other occasions when her mother was at work. These incidents occurred at least twice a week for six years or, in the words of K.B., "[t]oo many times to count." K.B. recalled that whenever she rejected Appellant's advances completely, he would be mean to her and R.B. When K.B. was in elementary school, she tried to tell her mother that Appellant had touched her genitals, but K.S. responded by questioning whether K.B. was confused or mistaken about what had happened. K.B. insisted she was not mistaken and her mother talked to Appellant about it. He denied it.

In 2008, R.B. told her school counselor what Appellant had done to her. K.S. took both R.B. and K.B. to the Children's Advocacy Center in Lewisville. Prior to the interview, K.S. asked R.B. if she could be mistaken or if it could have been an accident. K.B. described her mother as being "panicky" prior to the interviews and she told K.B. that they could be taken away from her and they might never see one another again. R.B. and K.B. did not tell the truth during their interviews because they were scared. Appellant continued to touch both of them inappropriately. In 2009, they were interviewed again but this time reported what Appellant had been doing to them. Nothing happened and Appellant returned home. He also continued to molest them.

In May of 2011, thirteen-year-old A.A. visited at R.B.'s home. Appellant got onto the bed where R.B. and A.A. were watching television and began rubbing A.A.'s feet. A.A. thought it was weird but she trusted him. Appellant moved from A.A.'s feet to her legs and he gradually moved his hand higher until he was touching her butt and vagina. He suddenly stopped when R.B.'s mother got home from work and walked into the room. A.A. told R.B. what had happened when they went to A.A.'s house. A.A. reported the assault to a school counselor a week later.

On June 1, 2011, R.B. used her cellphone to secretly record Appellant touching her inappropriately. After K.B. saw the video, she took R.B. to the Sheriff's Office rather than telling their mother because she was afraid that her mother or Appellant would delete the videos. Law enforcement conducted an investigation and a grand jury returned three indictments against Appellant.

## EXCLUSION OF POLYGRAPH EVIDENCE

In Issues One and Two, Appellant contends that the trial court abused its discretion by excluding evidence that he had taken and passed a polygraph examination in 2009. Toby Crow is an investigator with the Denton County Sheriff's Office. Investigator Crow was assigned to investigate R.B.'s and K.B.'s allegations against Appellant. Investigator Crow observed the interviews of K.B. and R.B. at the Child Advocacy Center through a one-way glass, but he did not actively participate in those interviews. He interviewed Appellant on November 13, 2009. During a two-minute portion of the interview, Crow asked Appellant whether he would take a polygraph and Appellant agreed. At trial, the State sought to introduce the interview, but the prosecutor requested a hearing outside of the jury's presence to address the State's contention that the polygraph portion of the interview should be redacted. Appellant's attorney argued that

the video should not be redacted to remove the discussion about a polygraph examination and he specifically stated that he did not want to introduce the results of the polygraph. The State responded that polygraph evidence is inadmissible. The trial court ruled that the video would be admitted without the polygraph portion. The jury returned to the courtroom and the State offered the redacted version of the video, State's Exhibit 22. Appellant affirmatively stated he had no objection and the trial court admitted it. The video was then played for the jury.

Investigator Crow also interviewed K.S. and he observed that she appeared to be torn between what her daughters were saying and what Appellant was saying. After speaking with Appellant, K.S., R.B., and K.B., he decided not to file a case against Appellant or send the case to the District Attorney's Office. The following exchange occurred during redirect examination:

> [State]: And you would agree with me that at least nowhere in your report does it make any mention of the fact that the girls had been at the [Child Advocacy Center] the year before to talk about allegations that had come out to CPS in 2008?
>
> [Crow]: No.
>
> [State]: Okay. And you can't say for certain whether or not you knew about that when you did this investigation?
>
> [Crow]: That's correct.
>
> [State]: Okay. And in 2009 you didn't have the benefit of -- of video of him touching [R.B.]; is that correct?
>
> [Crow]: The only thing I had the benefit of in 2009 was testimony of [K.B.] and [R.B.], testimony of [K.S.] and the testimony of [Appellant]. There was no other evidence.

In a hearing outside of the jury's presence, Appellant argued that Crow's testimony that there was no other evidence than the statements of the people involved had left a false impression with the jury that he did not conduct any additional investigation. Appellant asserted that he should be permitted to question Crow about the polygraph examination and the redacted portion of the

- 5 -

video should be admitted into evidence. The trial court denied Appellant's requests.

*Standard of Review*

A trial court has broad discretion in determining the admissibility of evidence. *Allridge v. State*, 850 S.W.2d 471, 492 (Tex.Crim.App. 1991). Consequently, an appellate court reviews a trial court's decision admitting or excluding evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex.Crim.App. 2010). The trial court's ruling will be overturned only if it is so clearly wrong that the ruling lies outside the zone of reasonable disagreement. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim.App. 2003). We will not overturn the trial court's decision so long as it is correct under any theory of law applicable to the case and the decision is within the zone of reasonable disagreement. *See Ramos v. State*, 245 S.W.3d 410, 418 (Tex.Crim.App. 2008).

It has long been the rule in Texas that the existence and results of polygraph examinations are inadmissible for all purposes. *Tennard v. State*, 802 S.W.2d 678, 683 (Tex.Crim.App. 1990); *Robinson v. State*, 550 S.W.2d 54, 59 (Tex.Crim.App. 1977); *Nichols v. State*, 378 S.W.2d 335, 337 (Tex.Crim.App. 1964); *Hoppes v. State*, 725 S.W.2d 532, 536 (Tex.App.--Houston [1st Dist.] 1987, no pet.). There are two primary reasons for excluding polygraph evidence: (1) the inherent unreliability of a polygraph test and (2) the tendency for the results to be unduly persuasive. *Martines v. State*, 371 S.W.3d 232, 250 (Tex.App.--Houston [1st Dist.] 2011, no pet.); *Marcum v. State*, 983 S.W.2d 762, 765 (Tex.App.--Houston [14th Dist.] 1998, pet. ref'd); *Russell v. State*, 798 S.W.2d 632, 635 (Tex.App.--Fort Worth 1990, no pet.); *see Romero v. State*, 493 S.W.2d 206, 210-11 (Tex.Crim.App. 1973), *overruled on other*

*grounds by Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App. 1992)(noting that polygraph evidence has generally been excluded due to potential sources of error in the test itself, including the competency of the examiner, the tendency of the jury to place too much reliance on the test results, the lack of standardization of test procedures, and the difficulty for jury evaluation of examiners' opinions). In limited instances, the erroneous admission of polygraph evidence may "open the door" to further inadmissible evidence regarding the polygraph results. *See Long v. State*, 10 S.W.3d 389, 398-99 (Tex.App.--Texarkana 2000, pet. ref'd), *citing Lucas v. State*, 479 S.W.2d 314, 315 (Tex.Crim.App. 1972) and *Patteson v. State*, 633 S.W.2d 549, 552 (Tex.App.--Houston [14th Dist.] 1982, no pet.).

Appellant asserts that the polygraph evidence and results became admissible to correct the misleading impression left by Investigator Crow's testimony that he did not present the case to the District Attorney's Office because he only had the interviews with K.B., R.B., K.S., and Appellant, and "[t]here was no other evidence." Appellant cites *Lucas v. State* in support of his argument that this testimony "opened the door" to admission of the polygraph evidence. In *Lucas*, the defendant testified that he had an agreement with the district attorney to take a polygraph, and if he passed, the district attorney would dismiss the case. *Lucas*, 479 S.W.2d at 315. The defendant also introduced evidence that the polygraph results showed he was not the person who had assaulted the complainant. *Id.* The trial court permitted the district attorney to testify that the defendant did not pass the polygraph test. *Id.* The Court of Criminal Appeals held that the defendant, by introducing the polygraph evidence, opened the door for the State to introduce the district attorney's testimony. *Id.*

The instant case is readily distinguishable from *Lucas* because the State did not introduce any evidence regarding the polygraph examination. The question in *Lucas* was whether the

inadmissible evidence introduced by the defendant about the polygraph examination opened the door for the State to introduce equally inadmissible evidence about the polygraph results. That is not the question here. Instead, we are asked to determine whether the State, by introducing admissible evidence which did not directly or even indirectly refer to a polygraph test, opened the door to inadmissible polygraph evidence. The Court of Criminal Appeals rejected such a claim in *Robinson v. State*, 550 S.W.2d 54 (Tex.Crim.App. 1977).

In *Robinson*, a capital murder case, the defendant met two other men, Smith and Holden, at a bar and agreed to drive them to an undisclosed place to gamble. *Robinson*, 550 S.W.2d at 55. Holden loaned Robinson a .22 caliber pistol and drove them to a location under Smith's directions. *Id.* Holden waited in the car while Robinson and Smith, both armed with pistols, left for approximately fifteen minutes. *Id.* When they returned, they were running and carrying a cigar box which contained currency and a .38 caliber pistol and holster. *Id.* Holden testified against Robinson at trial. *Id.* He said that Robinson, who was still carrying the .22 caliber pistol, told him that he had to shoot someone in the head at a grocery store. *Id.* at 55-56. They subsequently drove to another man's house and divided the proceeds of the robbery. *Id.* at 56. Robinson again stated that he had shot the man in the head. *Id.* The pistol Holden loaned to Robinson was identified as the murder weapon. *Id.* In a hearing outside of the jury's presence, it was established that Holden had entered into a plea bargain whereby he would testify for the State in exchange for probated sentences in the robbery and murder cases. *Id.* The State also required Holden to take a polygraph test and pass the test. *Id.* The trial court excluded the polygraph evidence. *Id.*

Holden's attorney testified at trial about the plea bargain. Defense counsel asked him whether Holden had been promised that he would receive no punishment in excess of probation

on the two pending indictments against him and the attorney replied affirmatively. *Id.* at 57. The State then elicited testimony by the attorney that the plea bargain was contingent upon Holden taking a polygraph test and passing it. *Id.* at 57-58. On appeal, the State cited *Lucas* and argued that the defense question about the plea bargain opened the door for the State to introduce the evidence regarding the polygraph exam and results. *Id.* at 60. The Court of Criminal Appeals found *Lucas* distinguishable because defense counsel did not question the witness about polygraph evidence. *Id.* The Court declined to hold that the polygraph evidence became admissible to correct a false impression because that would be in effect using a test which has been deemed unreliable to dispel a false impression. *Id.* Finally, the Court rejected the State's theory that a false impression had been created by defense counsel's question to Holden's attorney as to whether Holden had been promised "he will receive no punishment in excess of probation" for testifying. *Id.*

Like the Court of Criminal Appeals in *Robinson*, we decline to hold that the inherently unreliable polygraph evidence became admissible to dispel an alleged misleading impression. *See Robinson*, 550 S.W.2d at 60. Investigator Crow's testimony did not create a misleading impression in the mind of the jury. Crow testified that he did not present the case to the District Attorney's Office in 2009 because the only "evidence" he had was the statements from Appellant, the two complainants, and their mother, who was torn between what her daughters were saying and what Appellant was saying. All of the evidence Crow referenced in his testimony was admissible. Crow had over twenty-seven years' experience in criminal investigations and he presumably knew that polygraph evidence is inadmissible. As the sponsoring witness of State's Exhibit 22, Investigator Crow was present during the hearing conducted outside of the jury's presence and he was in the courtroom when the interview was

played for the jury so he was aware that the portion of the interview where he discussed a polygraph examination with Appellant had been muted. Considered in context, Crow's reference to "evidence" meant admissible evidence. Thus, his testimony was not false or misleading. We conclude that the trial court did not abuse its discretion by excluding evidence about the polygraph examination and the results. *See Robinson*, 550 S.W.2d at 60. We overrule Issues One and Two and affirm the judgment of the trial court.

ANN CRAWFORD McCLURE, Chief Justice

October 10, 2014

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J., not participating

(Do Not Publish)