COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



JESUS FERNANDO CHAVEZ, §

　　　　　　　Appellant, §

v. §

THE STATE OF TEXAS, §

　　　　　　　Appellee. §

§

No. 08-16-00084-CR

Appeal from the

120th District Court

of El Paso County, Texas

(TC# 20140D04986)

## **O P I N I O N**

Appellant Jesus Fernando Chavez pled guilty to murder and elected a jury to assess his punishment. Following a sentencing trial, the jury assessed a punishment of life imprisonment and a maximum fine. On appeal, Chavez argues three issues: (1) that the trial court erred when it denied his pretrial motion to suppress; (2) that the trial court abused its discretion when it admitted post-mortem photographs of the victim during the punishment trial; and (3) that the trial court abused its discretion in allowing the State to cross-examine a defense witness about an extraneous offense the witness had described in a prior statement given to law enforcement. We affirm.

### BACKGROUND

#### *The offense*

Chavez and his first cousin, Laura Lara (Lara), began a romantic relationship and dated for

approximately one and a half years before the commission of the offense. On August 21, 2014, Reyna Vaena, who works cleaning apartments at the complex where Chavez lived, reported she had overheard an argument between a man and a woman who were later identified as Chavez and Lara. Vaena testified she was cleaning an apartment that shared a wall with the other apartment. Vaena described that the woman sounded angry while the man kept telling her to shut up. Eventually, Vaena heard "blows" hitting the wall and the woman saying, "[d]on't hit me anymore. Stop hitting me now." Vaena informed others at the apartment complex, who then called the police.

When the officers knocked on the apartment door, Chavez asked what they wanted and slammed the door shut. Soon Chavez's daughter arrived on scene and slid open a window to look through the blinds. She reported to the officers that she saw blood and a female laying on the bed. An officer then looked in the window and confirmed that he, too, saw blood all over the apartment. The officers then used force to enter. After kicking in the door, they found Lara laying in blood on the bed, Chavez was sitting on the floor of the restroom, and there was blood on the walls and floor. After spotting a combat knife in the bathroom sink, officers handcuffed Chavez for their safety. When one officer asked him what had happened, in Spanish he replied, "[s]he broke my heart."

With the scene secure, emergency medical services (EMS) responded and began treating both parties. Chavez had lacerations on his neck and to the left side of his chest. While assessing his medical status, one of the responders asked him how he and Lara sustained their injuries. Chavez replied that he had beaten Lara with a bat and that he self-inflicted his own injuries and wanted to die. An aluminum baseball bat was found on the floor near the bed where Lara lay. A

2

note was also found next to Lara that stated in Spanish, "I will love you forever."

As for Lara, the responding firefighter found that she was bleeding heavily and coming in and out of consciousness. She had a laceration to the left side of her temple, a depressed skull fracture, bruises all over her body, a piece of her ear was missing, and several of her teeth were knocked out and lay on the bed. The firefighter testified that Lara repeatedly asked him not to hit her as he was assessing her condition.

EMS transported both Lara and Chavez to the hospital in separate ambulances. Despite undergoing surgery, Lara died several days later. Following performance of an autopsy, the medical examiner opined that Lara died of complications of blunt injuries to her head and listed the manner of death as homicide.

*Motion to Suppress*

After receiving treatment for his injuries, Chavez was later taken to a police station where Detectives Michael Lara and Abraham Gonzalez conducted a video-recorded interview. It is undisputed that Detective Lara read Chavez *Miranda* warnings in Spanish before asking him questions. Following the reading of each right, Chavez indicated he understood by nodding his head "yes." After he was arrested and indicted for Lara's murder, Chavez filed a pretrial motion to suppress oral statements he made to law enforcement and others. During the hearing, Chavez asserted he invoked his right to remain silent during his interview, yet Detective Lara ignored him.

Both the State and defense submitted translations of the recorded interview. Although nearly identical, the two translations differed from each other with certain entries.[1] What follows

_____

[1] The trial court considered both translations in ruling on Chavez's motion to suppress. While both parties contend that their translations are correct, they differ slightly from each other; because the trial court stated that it relied on both translations in its findings of fact and conclusions of law, we will consider both translations in our analysis. *See*

are pertinent portions of the translated statement provided by the parties beginning first with the

portion provided by the State:

> [Det. Lara]: Ok. I read you your rights, and you understood your rights, do you wish to continue with this interview?
>
> [Chavez]: Well, I don't like to remember what happened, so maybe not.
>
> [Det. Lara]: Well, like I told you, this is important. You asked me right now how the lady is. Right?
>
> [Chavez]: (Nods Yes).
>
> [Det. Lara]: Right? We can hear you and also let you know about the condition of the lady. Ok? We have a lot of questions for you, Sir. And you have questions for us. Right? We can continue … we can't … let me refrase [sic]. We cannot continue until you understand your rights. Do you understand? And this is just if you wish to answer any question I have. You do not … you do not have to answer any question I ask you. Do you understand.
>
> [Chavez]: (Nods Yes).
>
> [Det. Lara]: You do not want to answer if I say something you are not comfortable with. But as I heard, you have questions too. You have questions for us, and you need an answer. And that is how we work. I cannot ask you questions, we can not give you answers, if you don't understand … if we cannot understand each other.
>
> [Chavez]: No, but I do not want to talk.
>
> [Det. Lara]: So what … what is the problem you have?
>
> [Chavez]: I do not like to talk about what happened. It was something that … my mind was blank when I realized what I did, and I don't want to remember, but I always think about that. I have that image in my mind, and … and … I am not comfortable. I do not want to talk about that. To remember again.
>
> [Det. Lara]: Um-Hum. The answers you have for us … or about the lady's condition.

*State v. Martinez*, No. 08-08-00098-CR, 2010 WL 705930, at *7 (Tex. App.—El Paso Mar. 2, 2010, pet. ref'd) (not designated for publication) (considering both the State's and Defense's translations of an interrogation conducted in Spanish).

4

[Chavez]: Well, if you want to tell me. That's fine.

Next, in contrast, is the same portion of the transcript provided by Chavez:

[Det. Lara]: Okay. Now that I read you your rights and you understood your rights, do you wish to go on with the interview?

[Chavez]: Well, no. I do not like to remember what happened and I believe that it is better not to.

[Det. Lara]: Well, like I'm telling you, this is important. Like you asked me just now, right? How is the lady doing?

[Chavez]: [Nods]

[Det. Lara]: Right? That is how we can also listen to you and also inform you the condition of the lady, right? Since we have many questions for you, Sir, right? And you have questions for us, right? We can go on ahead, we cannot, let me correct myself. We cannot go on ahead before you understand your rights. Do you understand? And this is only when you wish or want to answer any question that I have. You do not have, do not have to answer, right? Any respon, responsable [sic] that you place, if I ask you something. Do you understand?

[Chavez]: [Nods]

[Det. Lara]: If you do not want to answer something. If I tell you something that not, you do not feel comfortable, you do not have to tell me. But you also have questions, I heard just now. You have questions by us [sic] that I imagine that you also want to get a response. And that is how we work. No, I cannot ask you questions. They cannot give you answers if you do not understand, if we do not understand each other.

[Chavez]: [Shakes head] No, well, I am not going to want to talk. [Speaking simultaneously]

[Det. Lara]: Then what, what is the problem you have right now?

[Chavez]: I don't like to talk about what happened. It was something that, that, that I had it in my mind, blank, by the time I was aware of what I did and I do not want to remember, but I always remember that. I have that, that [i]mage in my mind and, and, and no, I am not comfortable. And I do not want to talk about that. Remember again.

5

[Det. Lara]: Uh-huh. What answers do you have for us, or, or about the lady's condition?

[Chavez]: Well, if you want to tell it to me, that's fine.

After this discussion, Detective Lara transitioned to ask Chavez a multi-part background question—"I would like to know about you … I would like to understand what was happening."—but Chavez interrupted and began describing his relationship with Lara. In a long narrative response, Chavez accused Lara of not only having an affair with his daughter's husband, but with many other men who he said would laugh at him. Additionally, Chavez admitted he was going to kill Lara, but he didn't, then he describes how he unsuccessfully tried to stab himself in his heart.

Following the suppression hearing, the trial court denied Chavez's motion to suppress. Among other things, the trial court found that Chavez made equivocal and ambiguous statements during his interview regarding his desire to remain silent. After considering the totality of the circumstances, the trial court concluded that Chavez waived his right to remain silent.

*The trial*

After the jury was seated, Chavez pled guilty to the charge of murder and the parties began their presentation of punishment evidence. Among others, the jury heard testimony from two witnesses who are relevant to this appeal. First, the State called Dr. Janice Diaz-Cavalliery, a forensic pathologist working as a deputy medical examiner, who performed an autopsy examination of Lara. During Dr. Diaz-Cavalliery's testimony, the State sought to admit photographs taken during Lara's autopsy. Chavez objected on the basis that the photographs were more prejudicial than probative. Over Chavez's objection, the trial court admitted nine photographs which were then published to the jury.

For the defense, Chavez called his sister, Rosa Isela Vargas (Rosa). On direct examination, Rosa provided testimony that criticized Lara's treatment of Chavez and asserted he was submissive in their relationship. Rosa also described her brother in positive terms to the jury. On cross-examination, Chavez objected when the State attempted to impeach Rosa with prior inconsistent statements she had given to law enforcement. Chavez contended that Rosa's statement included reference to an extraneous offense for which he had not received notice and the mention of the offense called for speculation. The trial court overruled Chavez's objection but limited the State to asking Rosa not whether he abused his ex-wife, but whether she had previously told law enforcement that he abused his ex-wife.

After the trial concluded, the jury first answered a special issue and found that Chavez did not act under the immediate influence of sudden passion arising from an adequate cause. Next, in rendering its verdict on punishment, the jury assessed life imprisonment and a $10,000 fine.

## ISSUES

On appeal, Chavez raises three issues. First, he challenges the denial of his motion to suppress statements he made to law enforcement asserting he properly invoked his constitutional right to remain silent. Second, he challenges the trial court's admission of autopsy photographs as being more prejudicial than probative. Finally, he challenges the trial court's decision to allow the State to cross-examine a defense witness about her belief that Chavez had committed an extraneous offense, which she described to law enforcement in a prior statement, without requiring the State to provide notice or establish the offense by proof beyond a reasonable doubt

## MOTION TO SUPPRESS

In his first issue, Chavez asserts the trial court erred by failing to suppress the recorded

7

statement he gave to police in violation of his Fifth Amendment right to remain silent arguing he sought to terminate the interview three times.

*Standard of Review*

A trial court's ruling on a suppression motion is reviewed on appeal for abuse of discretion, with almost complete deference being given to its determination of historical facts, especially if those are based on an assessment of credibility and demeanor.  *Crain v. State,* 315 S.W.3d 43, 48 (Tex.Crim.App. 2010).  A trial court's rulings on mixed questions of law and fact that do not turn on credibility or demeanor are reviewed *de novo*.  *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex.Crim.App. 2015).  Whether any of Chavez's statements in either the State's or Chavez's translations constitute an unequivocal invocation of the right to remain silent is a mixed question of law and fact which does not turn on credibility or demeanor of any witness, so we review the issue *de novo*.  *See State v. Martinez,* No. 08-08-00098-CR, 2010 WL 705930, at *7 (Tex. App.— El Paso Mar. 2, 2010, pet. ref'd) (not designated for publication) (reviewing *de novo* the issue of whether a defendant invoked his right to counsel, which did not turn on any witness's credibility or demeanor).

*Invocation of the Right to Remain Silent*

The Fifth Amendment to the United States Constitution states that "[n]o person … shall be compelled in any criminal case to be a witness against himself[.]"  U.S. CONST. amend. V.  A suspect in custody has the right to remain silent and not make any statement to law enforcement officers, and he must be informed that any statement he makes may be used against him in court. *Ramos v. State,* 245 S.W.3d 410, 418 (Tex.Crim.App. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).  If the suspect indicates in any manner prior to

8

or during questioning that he wishes to remain silent, interrogation must cease. *Id.* (citing *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602). If a statement is governed by *Miranda* (that is, if the suspect is in custody while the statement is made), the failure to terminate questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a) (West 2018); *Urias v. State*, No. 08-01-00355-CR, 2006 WL 2516361, at *5 (Tex. App.—El Paso Aug. 31, 2006, pet. ref'd) (not designated for publication) (citing *Michigan v. Mosley,* 423 U.S. 96, 113, 96 S.Ct. 321, 331, 46 L.Ed.2d 313 (1975); *Sterling v. State,* 830 S.W.2d 114, 116 (Tex.Crim.App. 1992); *Dowthitt v. State,* 931 S.W.2d 244, 257 (Tex.Crim.App. 1996)). If the suspect does invoke his right to remain silent, the admissibility of the statements obtained afterward depend on whether the suspect's right was "scrupulously honored." *Ramos*, 245 S.W.3d at 418 (citing *Michigan v. Mosley*, 423 U.S. at 103–04, 96 S.Ct. 321).

While the suspect does not need to use any particular words to invoke his right to remain silent, the interrogating officer is not required to terminate his questioning unless the suspect's invocation of rights is unambiguous. *Kupferer v. State*, 408 S.W.3d 485, 489 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citing *Ramos*, 245 S.W.3d at 418); *Dowthitt*, 931 S.W.2d at 257). An officer does not violate a suspect's right to remain silent when he attempts to clarify whether the suspect wishes to remain silent, and the suspect may thereafter choose to continue to speak about the offense. *Williams v. State*, 257 S.W.3d 426, 432–33 (Tex. App.—Austin 2008, pet. ref'd) (citing *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003); *Barnes v. Johnson*, 160 F.3d 218, 224–25 (5th Cir. 1998)). We look to the totality of the circumstances in determining whether the suspect's right to remain silent was unambiguously invoked. *Watson v. State*, 762

9

S.W.2d 591, 597 (Tex.Crim.App. 1988).

Here, because both the State and defense provided their own translations of the recorded interview, we consider both in determining whether Chavez invoked his right to remain silent. *See Martinez*, 2010 WL 705930, at \*7.   If one translation provides a definitive answer as to whether Chavez invoked his right to counsel, we need not examine the other.   *See id*.

The first statement at issue, as interpreted by Chavez, reads as follows:

[Det. Lara]:  Okay.  Now that I read you your rights and you understood your rights, do you wish to go on with the interview?

[Chavez]:  *Well, no.   I do not like to remember what happened and I believe that it is better not to.*   [Emphasis added.]

In reviewing this statement, we find that Chavez did not respond in a direct manner but instead elaborated on how he preferred not to remember what had happened.   Had he remained silent after initially saying, "Well, no," it would more likely appear that he was directly addressing his right to remain silent.   Instead, Chavez inserted ambiguity into his response by further commenting.   A reasonable interpretation under the circumstances is that he felt uncomfortable about remembering the traumatic event.   *See Williams*, 257 S.W.3d at 433 ("[a]mbiguitiy exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances") (citing *Dowthitt*, 931 S.W.2d at 257).   Given the ambiguity created by his elaboration, Chavez is incorrect in his assertion that he unambiguously invoked his right to remain silent.   Thus, we conclude the trial court did not err in determining otherwise.

The second and third statements at issue, again as interpreted by Chavez, in context, read as follows:

[Det. Lara]:  If you do not want to answer something.   If I tell you something that not, you do not feel comfortable, you do not have to tell me.   But you also have

questions, I heard just now. You have questions by us [sic] that I imagine that you also want to get a response. And that is how we work. No, I cannot ask you questions. They cannot give you answers if you do not understand, if we do not understand each other.

[Chavez]: [Shakes head] *No, well, I am not going to want to talk.* [Speaking simultaneously]

[Det. Lara]: Then what, what is the problem you have right now?

[Chavez]: *I don't like to talk about what happened. It was something that, that, that I had it in my mind, blank, by the time I was aware of what I did and I do not want to remember, but I always remember that. I have that, that [i]mage in my mind and, and, and no, I am not comfortable. And I do not want to talk about that. Remember again.*

[Det. Lara]: Uh-huh. What answers do you have for us, or, or about the lady's condition?

[Chavez]: Well, if you want to tell it to me, that's fine. [Emphasis added.]

On appeal as below, Chavez relies on *Ramos v. State* in arguing that these statements were an unambiguous invocation of his right to remain silent. *Ramos v. State,* 245 S.W.3d 410 (Tex.Crim.App. 2008). In *Ramos*, detectives testified during the suppression hearing that the suspect told them during an interview that he "didn't want to talk about it anymore," after the detectives told him that a witness had implicated him in a murder. *Ramos*, 245 S.W.3d at 413–14. Despite this statement, the officer re-approached the defendant after only five minutes and began questioning him again. *Id*. at 419. The Court of Criminal Appeals concluded that the defendant's statement to the detective that he did not want to talk to him "was an unambiguous, unequivocal, and unqualified assertion of his right to remain silent." *Id*. at 418–19. When the statement was considered in context with others, *Ramos* concluded that a reasonable officer in the detective's position would not have found the suspect's assertion of his right to be ambiguous. *Id*. *Ramos* also concluded that the detective had not scrupulously honored the defendant's right

11

to remain silent when he approached the suspect only five minutes after he made his earlier statement, told him that a witness had implicated him in the crime, and told him that "it would probably be better if he told [them] what really happened." *Id*. at 419. Thus, under the totality of circumstances, the court found that the trial court erred in denying the defendant's motion to suppress his statements. *Id*.

In contrast with *Ramos*, the State argues that Chavez spoke with less clarity in his second and third statements wherein he stated: (1) "I am not going to want to talk;" and (2) "I don't like to talk about what happened." The State argues these statements are more closely analogous to statements reviewed by the Houston court of appeals in *Kupferer v. State,* 408 S.W.3d 485 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). In *Kupferer*, after detectives asked a suspect whether he wanted to talk about the offense, he replied, "[t]o tell you the truth, I really don't want to talk about it, but I mean[.]" *Kupferer,* 408 S.W.3d at 490. Finding the phrase "but I mean" amounted to a qualifier, *Kupferer* concluded that the suspect failed to unambiguously invoke his right to remain silent. By adding the qualifier, the suspect signaled indecision or ambivalence toward waiving his rights, and thus, a reasonable officer could interpret the statement as an expression of anguish or remorse. *Id*. Under the circumstances, in *Kupferer* the questioning detective was permitted to seek clarification. *Id*. at 491.

Having reviewed Chavez's second and third statements, we find that a reasonable interpretation of these statements is that he felt uncomfortable remembering the event as he had earlier explained. *See Williams*, 257 S.W.3d at 433. These statements also were made simultaneously while Detective Lara himself was talking. During the hearing, Detective Lara testified that he did not hear Chavez say that he did not want to talk, and the trial court also

12

concluded that Chavez's statement was not clearly heard in the recording.[2] The trial court also concluded that "Chavez nod[ded] his head affirmatively when directly asked if he want[ed] to provide his statement." On review, the video of the interview is consistent with the trial court's findings and conclusions. Applying an abuse of discretion standard, as we must, we defer to the trial court's determination that Detective Lara did not hear the statement as this determination is based on an assessment of credibility and demeanor. *Crain*, 315 S.W.3d at 48. Because Detective Lara did not hear Chavez's statement and it lacked clarity, *Ramos* is not applicable.

We find *Kupferer* persuasive, if not exactly on point, as Chavez's second statement admittedly lacked a similar qualifier as "but I mean." *See Kupferer*, 408 S.W.3d at 490. Nonetheless, when taken into context with the rest of the conversation, we conclude that, under the totality of the circumstances, Chavez's statements that "[n]o, well, I am not going to want to talk," failed to qualify as an unambiguous assertion of his right to remain silent. *See Watson*, 762 S.W.2d at 597 (reviewing courts should consider the totality of the circumstances in determining whether a suspect unambiguously invoked his right to remain silent). Given Chavez's previous statement that he did not want to think about what had happened, and the fact that he continued to speak with Detective Lara, Chavez failed to unambiguously assert he wanted to invoke his right to remain silent. Because of the ambiguity, we conclude that it was reasonable for Detective Lara to ask "[t]hen what, what is the problem you have right now?" *See Williams*, 257 S.W.3d at 433–34 (citing *Marshall v. State*, 210 S.W.3d 618, 628 (Tex.Crim.App. 2006) (stating that an officer is

---

[2] To the extent that the trial court's determination rests on witness's credibility and demeanor, we review the issue for abuse of discretion. *Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007). Because the issue of whether Detective Lara heard Chavez say that he did not want to talk rests on his testimony and credibility during the suppression hearing, and because the trial court concluded that this statement was not clearly heard in the recording, we review Detective Lara's testimony under the abuse of discretion standard and defer to the trial court's determination that Detective Lara did not hear Chavez's statement.

13

allowed to clarify a suspect's wishes regarding the right to remain silent before continuing an interview); *Barnes*, 160 F.3d at 224–25 (an officer is allowed to ask, "a few explanatory, noncoercive questions" to determine whether a suspect wished to invoke the right to remain silent)).

For the same reasons, Chavez's third statement—that he did not like to talk about what had happened and that he did not want to remember—also did not amount to an unambiguous invocation of his right to remain silent. Taken in context with the entire conversation, it was reasonable to conclude that Chavez was not "comfortable… [and that he did] not want to talk about that," with "that" clearly being the specific facts of the commission of the offense itself. Since Chavez indicated a willingness to continue to talk to Detective Lara (if not about the specific facts of the offense itself), his statements did not amount to an unambiguous invocation of the right to remain silent and Detective Lara was permitted to ask questions of clarification. Because we resolve the issue based on Chavez's translation of the interrogation, we need not further consider the State's translation. *See Martinez*, 2010 WL 705930, at *7. Likewise, because we find that no error occurred, we need not address whether Chavez was harmed by the trial court's denial of his motion to suppress.

We conclude that the trial court was correct in concluding that Chavez's invocation of his right to remain silent was not unambiguous, and thus it was proper for Detective Lara to continue to question him. Thus, the trial court did not err in denying Chavez's motion to suppress. Chavez's first issue is overruled.

## THE PHOTOGRAPHS

In his second issue, Chavez argues that the trial court abused its discretion in admitting

14

overly prejudicial autopsy photographs.

*Standard of Review*

We review the trial court's decision to admit autopsy photographs for an abuse of discretion. *See Davis v. State*, 313 S.W.3d 317, 331 (Tex.Crim.App. 2010); *Dawkins v. State*, -- S.W.3d --, 2016 WL 5957311, at \*10 (Tex. App.—El Paso Oct. 14, 2016, no pet.). If the trial court's decision falls within the zone of reasonable disagreement, it will be upheld. *Buntion v. State*, 482 S.W.3d 58, 71 (Tex.Crim.App. 2016). Where the trial court abuses its discretion, we disregard the error unless the error affected the defendant's "substantial rights." *Dawkins*, 2016 WL 5957311, at \*10 (citing TEX.R.APP.P. 44.2(b)). If harmful error is present from the record, we must reverse the defendant's conviction and remand for a new trial, but we cannot grant an acquittal based on evidentiary error. *Id*. (citing *Watson v. State*, 204 S.W.3d 404, 420 (Tex.Crim.App. 2006) (acquittal only appropriate in meritorious legal sufficiency challenge); *Adams v. State*, 639 S.W.2d 942, 943 (Tex.Crim.App. 1982) (proper remedy for trial error is reversal and remand to the trial court)).

Pursuant to Texas Rule of Evidence 401, evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. TEX.R.EVID. 401. Nevertheless, relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX.R.EVID. 403. Rule 403 "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Dawkins*, 2016 WL 5957311, at \*10 (citing *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007)). In conducting a Rule

15

403 analysis, we consider (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex.Crim.App. 2004) (citing *Montgomery v. State*, 810 S.W.2d 372, 389–90 (Tex.Crim.App. 1991) (op. on reh'g)).

Photographs depicting matters described by admissible testimony are generally admissible; nevertheless, not every photograph related to admissible testimony is itself admissible. *See id*. (citing *Martin v. State*, 475 S.W.2d 265, 267 (Tex.Crim.App. 1972)). When considering the admissibility of autopsy photographs, the following are nonexclusive factors that are also considered in a Rule 403 analysis: (1) the number of photographs offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are black and white or in color, (6) whether they are close-up, and (7) whether the body depicted is naked or clothed. *Dawkins*, 2016 WL 5957311, at *11 (citing *Gallo*, 239 S.W.3d at 762; *Erazo*, 144 S.W.3d at 489). "The availability of other means of proof and the circumstances unique to each individual case must also be considered." *Dawkins*, 2016 WL 5957311, at *11 (citing *Gallo*, 239 S.W.3d at 762). Nevertheless, a photograph should "add something that is relevant, legitimate, and logical to the testimony that accompanies it and that assists the jury in its decision-making duties." *Id*. (citing *Erazo*, 144 S.W.3d at 491). Where there are attributes about a photograph which are helpful to the jury, the photograph is admissible as long as the emotional and prejudicial aspects do not substantially outweigh the helpful aspects. *Id*. (citing *Erazo*, 144 S.W.3d at 491–92).

During the trial, the State sought to admit ten photographs marked as State's Exhibits 16 and 18–26. Chavez's trial counsel objected on the basis that the offered photographs were more prejudicial than probative, citing *Erazo* for that proposition. The State countered that the

photographs were admissible because they showed Lara's injuries in a more complete manner. The trial court overruled Chavez's objection and allowed the State to choose whether to offer State's Exhibit 23 or 24, but not both. The State opted to offer State's Exhibit 24.[3] The trial court then admitted the following nine photographs: State's Exhibits 16, 18, 19, 20, 21, 22, 24, 25, and 26. State's Exhibit 16 depicts a large laceration to the top of Lara's head. State's Exhibits 18 and 19 are close-up photographs of facial and head injuries Lara sustained. State's Exhibits 20, 21, and 22 are photographs of Lara's nude body, positioned face-down, which show large bruises on her torso and hip. State's Exhibit 24 is a photograph of Lara's brain after the medical examiner had removed the top of her skull, and State's Exhibits 25 and 26 show the interior of the skull after Lara's brain had been removed by the medical examiner. Following admission, the State immediately published the photographs to the jury. As presented, the photographs were in color and were relatively large as they were projected on a screen by the State.[4]

Pursuant to the factors laid out in *Erazo* and *Gallo*, we cannot say that the trial court abused its discretion in deciding that the probative value of the photographs substantially outweighed the danger of unfair prejudice. *Erazo*, 144 S.W.3d at 491-92 (if there are elements of a photograph that are genuinely helpful to the jury, the photograph is inadmissible only if the emotion and

---

[3] Chavez argues that the trial court's decision to allow the State to choose which photograph to offer was a "complete abdication" of its responsibility to rule on the admission of evidence. The trial court, however, only stated that it would admit one of the two proffered photographs, and it would allow the State to choose which one to offer, and stated that she "[got] to make a decision" regarding which photographs to admit. Given the trial court set a reasonable limit of duplicitous photographs, we are not persuaded this limit resulted in the court having abdicated its responsibility to determine admissibility of the evidence.

[4] While it is unclear from the record how large the photographs were and the exact manner by which the State published them, Chavez's trial and appellate counsel assert the photographs were "relatively large" and published to the jury with a "color projector." We will assume for the purposes of this appeal that this is true.

17

prejudicial aspects substantially outweigh the helpful aspects); *Gallo*, 239 S.W.3d at 762 (photographs showing the victim's skull and brain). All nine photographs depict the various injuries Lara sustained from Chavez's blows and they are probative of the extent to which Chavez carried out his offense. *See Dawkins*, 2016 WL 5957311, at *11 (finding that photographs depicting the bruising on the victim's nude body and photographs of the victim's brain with the skullcap removed were probative of the extent of the injuries caused by the defendant); *Maldonado v. State*, 452 S.W.3d 898, 903 (Tex. App.—Texarkana 2014, no pet.) (photographs of the extent of a victim's injuries caused by a defendant were highly probative punishment evidence). While these photographs are of the type that a reasonable person would find stark or gruesome, nonetheless they are probative of facts of consequence in a punishment hearing—i.e., the nature of the offense and the brutality with which it was carried out. *See Maldonado*, 452 S.W.3d at 903 (photographs of a victim's body at autopsy were highly probative in demonstrating the nature of the victim's injuries, which were pivotal considerations in determining the defendant's moral blameworthiness for committing the offense). They were also helpful to the jury in understanding Dr. Diaz-Cavalliery's explanation of the injuries Lara sustained, especially pertaining to State's Exhibits 24, 25, and 26, which showed evidence of internal injuries not otherwise visible externally. *See Flores v. State*, 299 S.W.3d 843, 857–58 (Tex. App.—El Paso 2009, pet. ref'd) ("[p]hotographs showing mutilation by the medical examiner may be admissible when the photographs show bruising or other damage that is attributable to an accused actions but is not visible externally") (citing *Ripkowski v. State*, 61 S.W.3d 378, 392–93 (Tex.Crim.App. 2001), *cert. denied*, 539 U.S. 916, 123 S.Ct. 2274, 156 L.Ed.2d 133 (2003)).

Thus, we conclude that the photographs qualified as highly probative evidence because

they helped to clarify Dr. Diaz-Cavalliery's testimony explaining the extent of Lara's injuries, and helped to establish the cause of death. *See Wilson v. State*, 2007 WL 2473475, at \*2 (Tex. App.—Corpus Christi Aug. 30, 2007, pet. ref'd) (not designated for publication) (citing *Harris v. State*, 661 S.W.2d 106, 107–08 (Tex.Crim.App. 1983) (a trial court does not abuse its discretion when it admits autopsy photographs which help explain a medical examiner's testimony)); *Maldonado*, 452 S.W.3d at 903. Likewise, the State did not require an inordinate amount of time to develop the testimony necessary to explain the photographs, the relevant testimony only taking eight pages in the reporter's record to develop; this fact does not weigh against their admissibility. *See Maldonado*, 452 S.W.3d at 904–05 (photographs which took three pages' worth of testimony to develop in a three-hundred-page record was a "neutral" factor in the admissibility analysis). Finally, the fact that the body was further mutilated by the autopsy as shown in State's Exhibits 25 and 26 does not preclude admission of these photographs because the mutilation was only caused to examine and portray the extent of internal injuries additionally caused by Chavez's conduct. *See Salazar v. State*, 38 S.W.3d 141, 151–52 (Tex.Crim.App. 2001).

While Chavez argues the holding in *Erazo* compels the same conclusion here, we conclude that the holding is distinguishable. In *Erazo*, the Court of Criminal Appeals held that a photograph of a murder victim's unborn child removed during an autopsy was not relevant to the victim's cause of death by gunshot wound. *See Erazo*, 144 S.W.3d at 488, 492. In contrast, here the photographs of Lara's internal injuries was probative of not only the cause of her death but also the extent of her injuries. These photographs showed "something more" that could not be shown by Dr. Diaz-Cavalliery's testimony alone. *See id*. at 493. Although Chavez argues that the State had no need for the photographs and only admitted them because they were "uniquely

disturbing," we disagree and find that, considering the factors laid out in *Erazo* and *Gallo*, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. The photographs were probative of the nature of the offense and the extent of Lara's injuries, and helped to explain Dr. Diaz-Cavalliery's medical testimony despite the fact that the body's mutilation was partly caused by the autopsy itself. *See Flores*, 299 S.W.3d at 858–59 (the fact that photographs are gruesome does not preclude their admission when they show the extent of injuries); *Hayes v. State*, 85 S.W.3d 809, 815–16 (Tex.Crim.App. 2002, en banc.) ("[c]hanges rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the [defendant]") (citing *Santellan v. State*, 939 S.W.2d 155, 173 (Tex.Crim.App. 1997)).

Accordingly, we conclude the trial court did not abuse its discretion in admitting the photographs such that its decision was outside the zone of reasonable disagreement. Because we find that no error occurred by the admission of the photographs, we need not address whether Chavez was harmed by their admission.

Chavez's second issue is overruled.

### TESTIMONY REGARDING EXTRANEOUS OFFENSE EVIDENCE

In his third issue, Chavez contends the trial court abused its discretion by allowing the State to cross-examine his sister, Rosa, about a prior statement she gave to police wherein she alleged he had abused his ex-wife. Chavez contends Rosa's prior statement amounted to speculative evidence of an extraneous offense that was highly prejudicial and inadmissible.

*Standard of Review*

A trial court's decision to allow testimony related to an extraneous offense is reviewed for

abuse of discretion.  *See Page v. State*, 213 S.W.3d 332, 338 (Tex.Crim.App. 2006).  The general abuse of discretion standard is set out in the preceding issue.

*Relevant Facts*

During the punishment phase of trial, Chavez called Rosa to testify on his behalf.  Early in her testimony, Rosa established she had a family connection with both parties involved in the offense—Chavez was her younger brother and Lara was a cousin she first met in 2013.  Rosa was asked to describe the relationship she observed between Chavez and Lara.  Rosa testified she began noticing at family events that Chavez and Lara would arrive together and eventually "they looked like a couple."  Rosa admitted she disapproved of their relationship—they were cousins and Lara was married.

Chavez's defense counsel then asked Rosa to describe what she observed about Lara and her behavior towards Chavez.  On one occasion, Rosa said she noticed that Lara would "yell at [Chavez] in an ugly way or she would order him around."  Rosa further testified that she approached Lara about her speaking to her brother in that manner, but Lara told her not to get involved.  Rosa then asked Chavez why he allowed Lara to treat him that way and she testified he responded by bowing his head in submission then said, "he loved her, that it was the first time that he was in love."  She ended her direct testimony by describing her brother for the jury with a few general statements:  "He was a very hard-working person.  He was noble.  He had a lot of dreams.  He was a good brother and a good son."

On cross-examination, the State questioned Rosa about a statement she gave to Detective Loya in September 2014.  The State asked her whether she told police the same information she earlier described for the jury—that her brother was "a good man, hard worker and noble[.]"  She

21

responded negatively. The State then asked her to confirm whether she told the police that "he was broke, mean, and a terrible person[.]" Rosa then denied that she had lied to police explaining she was angry and frustrated at the time.

As the State began to question her further about additional information in her statement, the defense objected and requested a bench conference. While at the bench, the prosecutor informed the court that Rosa's statement included two additional statements he wanted to address on cross-examination: first, that Rosa told police she observed Lara with bruises; and, second, that she told police Chavez had also abused his ex-wife. The defense objected that the State was getting into extraneous offenses for which it had not received notice and the prosecutors' questions would elicit speculative evidence as Rosa had used a qualifier of "I believe" when she made her statements.

Providing a two-part response, the prosecutor argued, first, that he did not give notice because he had not planned on introducing Rosa's statements directly; and, second, that Chavez himself opened the door to character issues by eliciting from Rosa assertions that even when Lara was mean to Chavez he responded submissively. The State argued that Rosa's statements to police contradicted her portrayal to the jury on direct examination. In response, Chavez defended the scope of Rosa's direct testimony by citing article 38.36 of the Texas Code of Criminal Procedure. TEX. CODE. CRIM. PROC. ANN. art. 38.36 (West 2018) (the state or the defendant are permitted to offer testimony as to facts and circumstances surrounding the relationship existing between the accused and the deceased in all prosecutions for murder). To this argument, the State responded that Chavez had opened the door to her prior inconsistent statements because Rosa's direct testimony portrayed Chavez's character broadly as a "good guy, an honest guy [when] he

22

[was] not." To police, the State argued Rosa had described her brother differently; that she told police she had observed Lara with bruises and she believed he also abused his ex-wife. In concluding their conference, the trial court ruled it would allow the State to cross-examine Rosa about her prior inconsistent statements related to Chavez's conduct, including her comment about Chavez abusing his ex-wife, but the State must narrow its questions to merely asking Rosa whether she made those previous statements to the police.

When cross-examination resumed, the prosecutor asked about Rosa's prior statements. Rosa admitted she had told police about seeing bruises on Lara's arms on three occasions. And, she also mentioned that when she asked Lara how she had received the injuries, Lara would tell her she was working out or that Chavez liked to "play rough." Rosa admitted she told police she believed Chavez had caused the bruises because Lara had told her she liked the fact that Chavez was "passionate." As for her second statement, Rosa admitted on cross-examination that she had previously told the police that she believed Chavez was physically abusive to his ex-wife. Rosa then added, "at that moment … I was furious against my brother and against -- towards the situation, what had happened." Rosa quickly added, however, that she was unsure whether it was true or not and she had no proof. When instructing the jury, the court included a charge stating, "you are to disregard the evidence of any prior convictions or extraneous offenses unless such prior convictions or extraneous offenses have been proven by the state beyond a reasonable doubt."

On appeal, Chavez argues that the trial court abused its discretion in allowing the State to cross-examine Rosa about her statement to police that Chavez had been abusive with his ex-wife. First, he contends he did not "open the door" to testimony regarding his ex-wife through his direct questioning of Rosa. Specifically, he argues that Rosa had limited her testimony to describing

23

Chavez's relationship with Lara only as permitted by article 38.36(a) of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.36(a). Second, he argues that even if Rosa's testimony opened the door to his relationship with his ex-wife, the testimony itself was far too speculative to meet the threshold requirements for admissibility pursuant to article 37.07, section 3(a)(1) of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2017). He argues that Rosa admitted she had no proof of whether any abuse occurred and, therefore, her testimony of this extraneous offense fell short of meeting the requirement of proof beyond a reasonable doubt. Finally, he argues he was harmed by the trial court's error because it influenced the jury's verdict and deprived him of a fair sentencing hearing.

The State counters that Rosa's testimony that Chavez physically abused his ex-wife consisted of proper impeachment evidence based on the inconsistency between her direct testimony and her prior statements to police. The State argues that Rosa had previously described Chavez to police as being abusive, yet, to the jury, she not only did not mention his abuse, she characterized him as being the weaker party who had tolerated Lara's conduct in their relationship. On cross-examination, the State's questions to Rosa served to impeach her regarding her portrayal of Chavez's character, not as substantive evidence of an extraneous offense. Arguing alternatively, the State also contends that even if the trial court abused its discretion by allowing the State to cross-examine Rosa about her statement that Chavez had abused his ex-wife, nonetheless, Chavez failed to preserve error on this issue as his objection at trial did not comport with his complaint on appeal.

We first address the impeachment argument. Pursuant to Texas Rule of Evidence 607, a

24

witness's prior inconsistent statement may be used to impeach the witness's credibility. TEX.R.EVID. 607. The witness, however, must first be asked if he or she made the contradictory statement. *See McGary v. State,* 750 S.W.2d 782, 786 (Tex.Crim.App. 1988). Here, it is clear from the record that the State laid the proper predicate and Chavez does not argue otherwise. *Irizarry v. State*, 916 S.W.2d 612, 616 (Tex. App.—San Antonio 1996, pet. ref'd) (witness properly impeached by asking whether he made a prior statement inconsistent with his testimony). Rosa was asked whether she told police that Chavez was physically abusive to his ex-wife. Rosa responded, "Yes, because at that moment … I was furious against my brother and against -- towards the situation, what had happened." Asked to clarify whether her statement was true or not, Rosa replied that she did not know and she had no proof.

Given that Rosa admitted she had given contradictory information to police, the State properly impeached her with her prior statement. *See* TEX.R.EVID. 607; *Irizarry*, 916 S.W.2d at 616. Impeachment is aimed at attacking the credibility of a witness. *See Adams v. State*, 862 S.W.2d 139, 147 (Tex. App.—San Antonio 1993, pet. ref'd). Rosa's testimony was not elicited as substantive evidence, but only as impeachment through a prior inconsistent statement. *See* TEX.R.EVID. 613(a) (a prior statement made by a witness which conflicts with his or her present testimony may be introduced for impeachment purposes). Since Rosa's prior statement was inconsistent with her testimony at trial, the trial court did not abuse its discretion in allowing the State to impeach Rosa in this manner by eliciting testimony about her previous statements regarding Chavez's abuse not only toward Lara but to his ex-wife as well. *See*, *e.g.*, *Iruegas v. State*, No. 05-99-01175-CR, 2000 WL 1570774, at *2 (Tex. App.—Dallas Oct. 23, 2000, no pet.) (not designated for publication) (trial court did not abuse its discretion in allowing testimony that

25

was elicited to impeach witness's prior testimony regarding a defendant's character, not to prove that the defendant had committed other extraneous offenses).

Moreover, given Rosa's portrayal of Chavez as the weaker partner who was ordered around by the victim, we agree with the State that it was entitled to rebut Rosa's depiction to the jury with her earlier statements to police that she believed he had abused Lara and his ex-wife. Although Texas Rule of Evidence 404(a)(2) allows a defendant in a criminal case to offer evidence of the defendant's pertinent trait, once admitted the rule allows the prosecutor to rebut the evidence. TEX.R.EVID. 404(a)(2)(A). "A pertinent character trait is 'one that relates to a trait involved in the offense charged or a defense raised.'" *Stitt v. State*, 102 S.W.3d 845, 849 (Tex. App.—Texarkana 2003, pet. ref'd). Additionally, evidence of extraneous unadjudicated offenses may be admissible if the defendant opens the door to the admission of such evidence, and if the defense creates a false impression in the minds of the jury, the prosecution may address and correct this impression. *Weatherby v. State*, No. 08-99-00452-CR, 2002 WL 2027573, at *7 (Tex. App.—El Paso Sep. 5, 2002, pet. dism'd as untimely filed) (citing *Monkhouse v. State*, 861 S.W.2d 473, 476 (Tex. App.—Texarkana 1993, no pet.)); *Hayden v. State*, 296 S.W.3d 549, 554 (Tex.Crim.App. 2009) ("[a] party opens the door by leaving a false impression with the jury that invites the other side to respond") (citing *Daggett v. State*, 187 S.W.3d 444, 452 (Tex.Crim.App. 2005)).

Although Chavez argues the testimony itself was far too speculative to meet the threshold requirements for admissibility pursuant to article 37.07, section 3(a)(1) of the Texas Code of Criminal Procedure, his argument is without merit given that the State neither offered the evidence as substantive proof nor was it admitted for that purpose. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2017) (permits evidence of an extraneous crime or bad act that is

26

shown to have been committed by the defendant by evidence beyond a reasonable doubt). Rather, this testimony was elicited only to impeach Rosa through her prior inconsistent statements. *See* TEX.R.EVID. 613(a) (a prior statement made by a witness which conflicts with his or her present testimony may be introduced for impeachment purposes). Because we agree the statement was merely offered to impeach Rosa's credibility and not as substantive proof, there was no need for the statement to meet threshold requirements of admissibility. *See*, *e.g.*, *Iruegas,* 2000 WL 1570774, at *2. Thus, we need not address whether Chavez preserved error with his objection regarding the admissibility of the evidence. *See* TEX.R.APP.P. 47.1. Additionally, we note the trial court included an instruction to the jury to disregard any extraneous offense not proven beyond a reasonable doubt. Having found that the trial court did not err in allowing the State to impeach Rosa with her prior inconsistent statements, we need not address whether Chavez was harmed by the trial court's ruling.

Chavez's third issue is overruled.

## CONCLUSION

We overrule Chavez's first, second, and third issues. The trial court's judgment is affirmed.

GINA M. PALAFOX, Justice

June 6, 2018

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

27