# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00627-CR

---

**Xavier Gutierrez, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 277TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 19-2669-K277, THE HONORABLE STACEY MATHEWS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

After Xavier Gutierrez pleaded guilty to aggravated assault with a deadly weapon in a motor vehicle, Tex. Penal Code § 22.02(b)(3)(B), the jury assessed punishment at 45 years in prison. Gutierrez contends that the State's extraneous-bad-act evidence admitted during the hearing on punishment should have been excluded under Texas Rule of Evidence 403, that the State's withdrawal of a plea offer caused his attorneys to render ineffective assistance of counsel by forcing them to trial on too short notice to lodge proper objections, and that the court erred by leaving unredacted hearsay in a nurse's report. We will affirm the judgment.

## BACKGROUND

On December 15, 2019, Philip Gonzalez was driving in Round Rock in a white Nissan Frontier pickup. He had spent the evening with his girlfriend, Glenda,[1] and was heading

---

[1] Glenda is a pseudonym.

home at around 11 p.m. because he was starting a new job the next day improving the computer labs at Austin Community College.

He testified that he was driving his regular route home on A.W. Grimes Boulevard when, suddenly, his vision went black. His ears were ringing. He did not know what was going on, but he knew he was still behind the wheel and in trouble. He tried moving his fingers and toes, but his body just gave up and he lost consciousness.

The driver of another car near Gonzalez's truck testified that he heard gunshots, then saw the white pickup come right at him, hit the curb, roll over four or five times, and hit an electrical pole, knocking wires down and causing sparks. He said the wreck looked like a movie scene, and he was very concerned for the safety of any occupant of the pickup.

Gonzalez testified that he woke up in somewhat of a daze in his truck. He said he remembered trying to reach out to text Glenda. He usually texted her to tell her he made it home safely. He then saw the flashlights of first responders who then helped him get out of the truck by cutting off its roof.

He regained consciousness in the ambulance, and the paramedic told him he had been in a car accident. He passed out, then regained consciousness in the emergency room. He had a hard time standing up by himself. He was in a neck brace because doctors thought he might have broken his neck. He learned that he had been shot in the head, just above his left ear.

Earlier that same day, Gutierrez went to Taylor to his girlfriend Anna's[2] company holiday party. Coworkers picked up Gutierrez and Anna at her parents' house in a white Ford F-150 pickup. Gutierrez and Anna had been dating since October, and Gutierrez moved in shortly after they began dating. Anna testified that she went outside to smoke a cigarette.

---

[2] Anna is a pseudonym.

2

Gutierrez came out and told her that she should not have been out there by herself because men seated near her were saying things about her in Spanish. Anna went inside the house to the bathroom, and, when she came out, Gutierrez grabbed her and, she testified, "pulled me, like—like a Raggedy Ann doll, and then squeezed the side of my stomach." Coworkers pulled them apart. Anna's assistant manager's sister talked to Anna about her sister's experience with domestic violence. Anna testified that something in Gutierrez "switched" and that, even though he did not attack anyone, he said "I'm not leaving her alone" repeatedly and threatened to shoot the men who allegedly said something about Anna. She testified that Gutierrez usually carried a gun and had seen him accidentally fire it twice—once while playing with it while walking her home from work and once when he dropped it in her room at home. She had not seen his gun that night.

Anna and her coworkers left the party to return home. She said she, the assistant manager, and the assistant manager's sister developed a plan to drop Gutierrez off at Anna's parents' house so he could sleep off his intoxication. Anna would stay the night with the assistant manager. She and Gutierrez could then converse the next day to decide how to move forward. They did not discuss this plan with Gutierrez. She deliberately sat on the opposite side of the truck from Gutierrez. When they pulled up to Anna's parents' house, Gutierrez got out of the truck, and the truck drove away. Anna testified that she thought he would go inside and sleep it off. She did not hear from Gutierrez until a day or two later. When Anna returned home the next day, her mother, Tisha Vaughn, told her what had happened the night before. Anna testified that when her mother "started shaking, her eyes start[ed] moving, like, she was scared still."

Vaughn testified that she and her husband returned from a date night on December 15, 2019, really tired and ready to go to sleep until Gutierrez knocked really hard on

3

the door.  Vaughn testified that Gutierrez was panicked and told her that Anna had been kidnapped.  She drove her car to look for Anna, and Gutierrez sat in the passenger seat.  They stopped at a red light at an intersection with A.W. Grimes Boulevard.  She asked Gutierrez to describe the vehicle that had taken Anna.  He told her it was a white, short, small truck.  Vaughn testified, "I happened to see a white truck coming.  I was just you know, I was like, 'Is that an example?  Is that the truck right there?'"  Vaughn testified that Gutierrez said, "'Yes that's him,' and then pulled out his gun and started shooting."  She hit Gutierrez in the chest and told him to stop.  She testified that she saw a man in the white truck and that "I think he shot him in the head because I saw him slump over, and his head went down" and then "the white truck end[ed] up coming over into the left lane and then hitting a pole, and then it flipped and blew up."  Vaughn testified that Gutierrez then shot several times at a gold car.  She said she drove home because she was scared.

Meanwhile, Gonzalez's parents were getting ready for bed and were scrolling through their phones.  They saw messages saying that lights were out, that gunshots were heard, and that there was a car accident on A.W. Grimes.  Less than half an hour later, Glenda called and asked if Mrs. Gonzalez had heard from Gonzalez.  Glenda said Gonzalez had not returned her calls or texts.  Mrs. Gonzalez speculated that he might be getting gas or lunch for the next day, but Glenda told her that a tracker application showed he was at a hospital.  Mrs. Gonzalez went to the hospital where she waited for over half an hour before she got news.  As a nurse, she knew when she was taken to a side room that the news would not be good.  Gonzalez was in intensive care where he was in a neck brace, screaming, vomiting, hallucinating, unable to see, and having severe tinnitus.  During this time he also had a catheter installed because he could not urinate, got turned to avoid ulcers, was held down to get an intravenous line installed, and was

questioned by a psychiatrist as they attempted to discover how he got shot and had a wreck, among other tests and treatments. She described the night as traumatic as she flipped from "mom" role to "nurse" role, realizing the possible implications of the injuries that were being discovered.

Round Rock Police Detective Leigh Knight testified that she did not initially respond to the scene of the accident because the reports of shots fired and the truck wreck seemed to be separate scenes. When she learned that Gonzalez had a bullet lodged in his brain, she went to the scene but was unable to develop any leads even after questioning Gonzalez and others. Video footage from the area had a gap because of the interruption in electrical service caused by the truck hitting the power pole.

A few days later, after seeing several social media posts about the incident, Vaughn told the police about the shooting and gave them a picture of Gutierrez. She testified that several days later, Gutierrez came back to her house expecting to stay there. She told him "no." Gutierrez told her he did not remember that evening because he had blacked out.

Knight testified that Vaughn's report caused the disparate parts of the investigation to fall into place. Police learned that Gutierrez was wearing an ankle monitor when the shooting occurred. The GPS coordinates of his ankle monitor showed that he was in the area at the time of the shooting. Knight interviewed Gutierrez, who did not admit shooting Gonzalez until after he was confronted with witness statements and physical evidence. Knight testified that Gutierrez eventually described the events and told them where to find the gun he used in the offense. He had hidden it in his brother's bedroom in a box spring mattress. Ballistics tests showed that the gun produced the shell casings found at the scene. Knight described Gutierrez as upset but not aggressive. She said he cried quite a bit and vomited. About an hour into the

5

interview, Gutierrez asked if Gonzalez was going to be okay.  She said Gutierrez asked her to apologize to Anna for scaring her and for putting her mother in danger during the shooting.  She said that at the very end of the interview he began crying again and Knight told him "it's going to be okay, It's not a homicide."  She testified that Gutierrez said, while wiping away his tears, "Yeah, but it's attempted murder or something."  Knight testified that she could not agree that Gutierrez understood the gravity of the shooting.

Gutierrez's mother, sister, and youth pastor testified regarding his character.  His mother testified about an incident that occurred when Gutierrez was 13 years old when she had decided that he should live with his father for discipline.  She knocked on his father's door and said, "I need your help with Xavier.  Here are his things."  His father took Gutierrez's bags to the end of the driveway and said, "No, I'm not going to take him."  Gutierrez's mother nevertheless drove away, and Gutierrez stayed with his father and did well in school for "some time" before he moved back in with her.  She also testified that he was very good with his five-year-old daughter.  Gutierrez's sister testified that he was her closest brother and that he was very protective of her.  She said that, despite the other testimony, she still loved him and believed he could change.  His youth pastor testified that Gutierrez was not a person who got "high" off of committing crimes but was more likely to do something stupid because of a dumb decision, not because he went out to hurt somebody.  The youth pastor was not aware of the extraneous bad acts that form the basis of Gutierrez's issues on appeal.

The neurosurgeon who treated Gonzalez on the night he was shot testified regarding his treatment and prognosis.  He testified that most people who get shot in the head die.  He said the bullet entered near Gonzalez's left ear and progressed toward the back of his head, stopping two or three millimeters short of the midline—a critical detail because wounds

that traverse the midline are almost always fatal. He testified that Gonzalez's carotid artery was, by pure happenstance, slightly shifted to the right by a couple of millimeters which caused it not to be in the bullet's path. He testified that he decided against removing the bullet because its path had taken it very close to speech areas of the brain and areas that process vision; any surgical intervention had a much higher risk of causing new injury. He testified that the injury to Gonzalez's brain caused his seizures. He said that medication cannot guarantee full control of seizures and that seizures can be life-threatening. He said that people who have loss of a visual field have a higher incidence of running into things or having car accidents. He testified that

> in many ways, it's very miraculous that [Gonzalez] made it through those number of factors. Just starting with the motor vehicle crash into a telephone pole that flipped the vehicle, already the risk of fatality with that alone is extremely high. That's—and that's all that we knew when he arrived to the ER was that portion of the damage, but then as you take that a step further and recognize the—the trajectory of the bullet as it passed through the brain, off by one or two degrees, and its entrance could have been a fatal event. Had he not had this slight difference in where his superior sagittal sinus laid, it absolutely could have been a fatal event. Had the bullet gone a few millimeters higher or lower, it could have damaged a very major artery in the brain including the carotid artery, had it gone just a few millimeters lower.

He concluded by saying that "quite a number of things that had to happen right for him to be here with us today."

Gonzalez and his parents testified regarding the effects of the shooting. In high school, Gonzalez was on the swim team, in the National Honor Society, and in a history club he founded. He was a lifeguard and water-safety instructor and was involved in church and community volunteer activities. Gonzalez was an Eagle Scout and had spent summers as a staff member at Philmont, a high-adventure base for scouts in New Mexico, and hoped to lead groups

7

there as a ranger.  He was a mentor and guide to his younger brothers, including his brother who has autism.  He planned to join the military with the goal of becoming an officer.

Gonzalez testified that his brain injury basically reduced him to infancy for a while.  He underwent months of rehabilitation relearning how to walk and how to read.  Relearning how to climb stairs took a month.  It took him a while to relearn how to write.  He said he still reads more slowly and takes longer to comprehend things.  He said, "For the longest time, I couldn't—like, in rehab, they show me like a picture of a pear, I couldn't even identify it, what that was."  His peripheral vision to his right side is permanently destroyed in both eyes.  He has seizures that cause him to have blurred vision, shake, and lose consciousness.  Every time he has a seizure, he cannot drive for another three months.  He cannot be a ranger or scoutmaster in charge of groups because of the dangers to all if he has a seizure.  He can swim but must be supervised in case he has a seizure.  He had a seizure while alone with his then-12-year-old brother; the boy is undergoing counseling to deal with the lingering effects of seeing his brother's trouble.  Gonzalez cannot join the military because of his condition.  His girlfriend broke up with him six months after the shooting because, he testified, "she just couldn't take it anymore, the trauma and the emotions that I already exhibited to her" through his rehabilitation.

Gonzalez testified that after the shooting he experienced "mental issues" for the first time in his life.  He was depressed.  When he went home from the hospital, he cried "nonstop" without knowing why.  His anxiety persists, and he testified that he has sleepless nights where "it just keeps repeating over and over again and the whole thing, it just haunts me to this day."  He revealed at trial that the anxiety and depression made him think of harming himself.  He testified that he "knew, like, that wasn't—you know, that wasn't the right response.  But there are many times in the two years where I just—I just thought about that."

Mrs. Gonzalez testified that Gonzalez's injuries and continuing treatments were a huge financial burden at the moment and that the logistics of getting him to his appointments were challenging. There were only two neuro-ophthalmologists in the area, and the one in West Lake Hills is not close to Round Rock and is difficult to get in to see. He had to go to a subspecialist for seizures, which brought more copays, imaging, labs, and trials. She said someone had to drive him to the appointments and attend as an advocate. Managing the claims, discovering what is covered by insurance, and dealing with collection agencies was another level of difficulty. She said his seizures took away his ability to drive and his ability to perform jobs independently like lifeguarding, for which he could not be recertified. The seizure led to more testing. She said the lingering injuries, anxiety, loss of confidence, and panic attacks caused him to be in fight mode and to avoid crowds, even for seemingly low-key events like a chamber music concert. Mrs. Gonzalez testified that his condition had affected his brother, whose autism prevents him from fully understanding what happened to Gonzalez. Mrs. Gonzalez testified that they had moved away from family to Round Rock to escape violence and danger. She said that she never thought she would have to worry about protecting Gonzalez, but the shooting made her feel she had failed to protect her son. She said that going through rehab and speaking to the specialists had put her in anger mode more than she liked.

Gonzalez's father testified that, though he was supposed to be the rock that his family can lean on, his son's injuries devastated him. Mr. Gonzalez described himself as broken because his son was hurt in a way Mr. Gonzalez could not fix. Gonzalez's future was limited by a condition he did not deserve. Mr. Gonzalez testified that the looming threat of seizures ruined his peace because of the possibility that Gonzalez might have a seizure that could hurt or kill him. Mr. Gonzalez said he is scared every morning when he walks downstairs and prays that

when he knocks on Gonzalez's door he will answer. He said there are days when he walks by Gonzalez's room and stands there listening to make sure that Gonzalez is still breathing. Mr. Gonzalez testified "my peace is broken, guys. My peace is gone."

## DISCUSSION

Gutierrez raises three issues on appeal related to the admission of evidence concerning extraneous bad acts. The trial court has broad discretion to admit evidence at the punishment phase:

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Code Crim. Proc. art. 37.07, § 3(a)(1).

To preserve error for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see also* Tex. R. App. P. 33.1. We review the admission of evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id*. at 418. The trial court abuses its discretion if its decision to admit evidence lies outside the zone of reasonable disagreement. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). Even if the trial court erred in admitting

10

evidence, the error is reversible only if it affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We consider the entire record in determining whether any error had a substantial and injurious effect or influence in determining the jury's verdict. Tex. R. App. P. 44.2(b); *Morales v. State*, 32 S.W.3d at 867.

**Rule 403 does not require reversal.**

By his first ground on appeal, Gutierrez contends that, despite the broad scope of evidence that can be deemed relevant under article 37.07, the court should have excluded evidence of an extraneous sexual assault under Texas Rule of Evidence 403. Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Gutierrez concedes that he did not object on that basis at trial but urges that his pretrial request that the court specifically enforce a plea bargain that was discussed but not formally entered somehow preserved an objection based on Rule 403. It did not.

To preserve objections to the admission of evidence, parties must object at trial and must have "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a). Nothing in the discussion of the plea bargain conveyed to the court that the State would offer some unspecified evidence that Gutierrez would object to because its probative value would be substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. *See* Tex. R. Evid. 403. We overrule ground one.

11

**Claim of ineffective assistance of counsel fails.**

By ground two, Gutierrez argues that the State "unintentionally but in effect induced ineffective assistance of counsel by abrogating what defense counsel had good reason to believe was an oral plea agreement for 30 years in [prison,] which plea contract the State should have honored." As a result, he contends, he was forced to trial by jury on extremely short notice without sufficient opportunity to assess the Rule 403 balancing test factors or explore evidence to controvert the extraneous-bad-acts evidence.

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence (1) deficient performance by counsel and (2) resulting prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). The appellant must first demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687-88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017). Our review of counsel's representation is highly deferential; we must "indulge in a strong presumption that counsel's conduct was not deficient." *Nava v. State*, 415 S.W.3d 289, 307-08 (Tex. Crim. App. 2013); *see also Strickland*, 466 U.S. at 689. To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012). If trial counsel has not been afforded the opportunity to explain the reasons for his or her conduct, we will not find a deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308 (quoting *Menefield*, 363 S.W.3d at 593). If counsel's performance is deficient, the appellant must also show the existence of a reasonable

12

probability—one sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). For ineffectiveness claims regarding counsel's performance during the punishment phase, the defendant must "prove that there is a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict." *Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

Before jury selection on Friday, November 12, 2021, the attorneys recounted their recollections of the plea negotiations. Defense counsel stated that over the course of pretrial discussions, the State said that 30 years was the "bottom line," which Gutierrez's attorneys took as an offer. The State's attorneys stated that they meant that Gutierrez had to be willing to accept a punishment of 30 years before they would discuss with Gonzalez the possibility of a plea. The State's attorney testified that he would not have "very difficult and very anxious, anxiety-ridden conversations with very seriously injured victims until we're actually at numbers that are in the realm of possibility." He said that 30 years was the threshold for those discussions, not a binding offer for a plea bargain.

When Gutierrez communicated on Wednesday, November 10, 2021, that he would agree to a punishment of 30 years, the State's attorneys then talked with Gonzalez and his family that afternoon concerning the pros and cons of the plea bargain. (These discussions and negotiations were proceeding in tandem with plea negotiations for a charge of sexual assault by Gutierrez.) After Gonzalez informed the State later that evening that he wanted to go forward with the trial, the State informed Gutierrez's attorneys that his offer to plead to 30 years in prison

13

was rejected. The jury then heard evidence on November 15-17, 2021. The record does not demonstrate that there was a plea agreement to enforce. Further, the record does not show that Gutierrez's counsel did not have sufficient time to prepare for the trial, nor does it show that the amount of prep time between the State's disavowal of a 30-year prison term and the beginning of the hearing five days later was the reason for Gutierrez's counsel's choice not to lodge objections under Rule 403.

The record does not demonstrate that Gutierrez's counsel's performance was deficient for failure to raise objections to the extraneous-bad-act evidence. Gutierrez complains that 84% of the testimony on the first day of the punishment phase concerned extraneous offenses unrelated to the shooting of Gonzalez. A former girlfriend of Gutierrez testified that, in 2017, while returning home from a church party, he wanted to have sex. She testified that her answer of "no" angered him, so he parked the car in a middle school parking lot and told her she had to have sex with him to go home. Still she said "no," so he strangled her and coerced her into having sex while their infant was beside them.[3] She was examined by sexual assault nurse examiner (SANE) Amanda Brookshire, who testified about that examination. Another former girlfriend testified that in 2019 Gutierrez slapped her, took her phone away and smashed it, and stole money from her. Gutierrez complains that this testimony was a "full-frontal assault on character," but Texas law expressly allows courts at punishment to deem as relevant evidence concerning the defendant's "general reputation, his character, [and] an opinion regarding his character." Tex. Code Crim. Proc. art. 37.07, § 3(a)(1). Given the broad scope of evidence that is relevant at punishment, however, counsel may have chosen not to make futile objections.

---

[3] Gutierrez asserts without dispute by the State that after the trial in this case he pleaded guilty to sexual assault in that case and accepted a sentence of two years in prison.

14

*See id.*; *see also Wood v. State*, 4 S.W.3d 85, 91 (Tex. App.—Fort Worth 1999, pet. ref'd) (explaining that counsel is not ineffective for failing to make futile objections). The record does not show that the State's rejection of the plea bargain on November 10 caused any objections to not be raised in the November 15 session. We do not find counsel's choice not to object so outrageous that no competent attorney would have engaged in it.

Further, even if counsel were ineffective for failing to object, Gutierrez did not show that there was a reasonable probability that the jury would have reached a more favorable verdict had his counsel objected. The testimony set out above regarding the injuries Gutierrez inflicted on Gonzalez—a person who just happened to be driving a truck that looked somewhat like the truck in which Gutierrez claimed Anna had been kidnapped by her coworkers—was compelling. Gutierrez shot at a truck containing a solo driver while the truck he sought had minutes before contained several people. The testimony described the physical, mental, and emotional suffering he inflicted on Gonzalez that night, during his rehabilitation, and for the rest of his life. The consequences radiated beyond Gonzalez to his family, to his now-former girlfriend, and to the people he might have served had he been able to continue as a lifeguard and a scout leader and to realize his ambition to be a military officer. Anna described Gutierrez's carelessness with his gun on two other occasions, his roughness with her at the party when he told her she should not go outside by herself, and his threats to shoot the men who supposedly talked about her. Vaughn testified that, after shooting Gonzalez, Gutierrez shot at a second vehicle that did not match the description of the vehicle he supposedly sought. Gutierrez did not admit his involvement to police until several days after the incident, after Vaughn's report and after police tied him to the scene through his ankle monitor. The bulk of the State's jury argument on punishment concerned the instant case, not the prior offenses. The State argued that

15

the evidence supported a 99-year sentence and that justice would not be done with a sentence of less than forty years. The jury imposed a sentence of 45 years in prison, less than half the maximum punishment range that included up to 99 years or life in prison. *See* Tex. Penal Code §§ 12.32 (first-degree felony punishment range), 22.02(b)(3)(B) (aggravated assault that is first-degree felony). We overrule ground two.

**Admission of sexual assault nurse examiner's report excerpts does not require reversal.**

By his third ground, Gutierrez asserts that the court erred by failing to redact certain aspects of SANE Brookshire's report that were "non-medical hearsay narrative." The July 2017 report described the examination of Gutierrez's girlfriend after the middle-school-parking-lot incident.

Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay generally is not admissible unless otherwise excluded by statute or rule. *Id.* R. 802. A statement made for medical diagnosis or treatment is excepted from the hearsay exclusion if it "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." *Id.* R. 803(4). Hearsay from a report can be admissible if the evidence shows that the examinee knew that the examination was for medical diagnosis and thus that telling the truth was important. *Taylor v. State*, 268 S.W.3d 571, 588-89 (Tex. Crim. App. 2008). The Court of Criminal Appeals held that adults and children of sufficient age "have an implicit awareness" that medical professional's questions "are designed to elicit accurate information and that veracity will serve their best interest" and that appellate courts review record "not for evidence of such an awareness, but for any evidence that would

16

*negate* such an awareness." *Taylor*, 268 S.W.3d at 589; *see Barnes v. State*, 165 S.W.3d 75, 83 (Tex. App.—Austin 2005, no pet.) (observing that it was not necessary for witness to have inquired into whether victim appreciated need to be truthful where victim was ten years old and was "sufficiently mature to be interviewed outside her grandmother's presence"); s*ee also Franklin v. State*, 459 S.W.3d 670, 677 (Tex. App.—Texarkana 2015, pet. ref'd) (because SANE is nurse, courts can infer from the record that victim knew importance to tell truth to obtain medical treatment or diagnosis). That evidence must be pertinent to treatment. *Taylor*, 268 S.W.3d at 591.

The report contained quotes from the patient under specified categories in the form. Under the "threat" heading the patient quotation was "He said, he'll make my life more miserable than it is." The record does not contain an express ruling on this statement separate from the other statements. Under "coercion" the patient quotation was, "He just kept saying, I'm ready when you are." The trial court held that this quote related to the mental effects on her. Under "fear" the report shows that Brookshire believed the patient feared for her own death or physical injury, and the patient quotations were "I'm afraid that he's going to appear and make things worse" and "[w]hen he was choking me I couldn't breathe. I thought I was going to die." The trial court held that the former related to her mental health and that the latter related to medical diagnosis. Several pages later, Brookshire transcribed this question-and-answer series:

[Q]: Did the assailant say anything during strangulation?

[A]: "He kept saying for me to stop crying and to shut up."

[Q]: What did you think would happen to you?

[A]: "I thought he was going to kill me."

17

We do not find an express ruling on these statements separate from the other statements.

Gutierrez complains that these statements were not made for medical diagnosis, were bolstering, and were inflammatory. He also argues that Brookshire was adducing evidence for prosecution, not for treatment or diagnostics.

We conclude that the trial court did not abuse its discretion by finding the challenged statements within the 803(4) hearsay exception. The assault victim was seventeen years old, and we find no indicia that negates her awareness that she should tell the truth. The report states that Brookshire discussed with the victim medical treatments including medication and further examinations, illustrating that the victim was aware the discussions were related to diagnosis and medical care. Brookshire testified that obtaining a detailed history for medical treatment is particularly important in cases of strangulation to determine whether the nurse should continue with the sexual-assault examination or should immediately refer the patient for tests for brain damage or other internal injuries. The questions about fear, threats, and coercion help assess what resources might be needed for safety planning and mental-health treatment. Indeed, based on the examination, Brookshire recommended further evaluation in the emergency room; when the patient declined, preferring to follow up with her primary-care provider, Brookshire told her what symptoms to look for that would indicate she should go to the emergency room. Brookshire explained that the threats and comments about the patient's fear helped her develop a safety plan to provide for future physical and mental health. The trial court's admission of the excerpts above was at least within the zone of reasonable disagreement and not an abuse of discretion. *See Walters*, 247 S.W.3d at 217; *see also Rodriguez v. State*, 280 S.W.3d 288, 290 (Tex. App.—Amarillo 2007, no pet.) (observing that "Texas courts applying the exception for hearsay statements established by Rule of Evidence 803(4) have held

18

the presence of a parallel law enforcement purpose does not preclude application of the exception").

Even if the trial court abused its discretion by admitting the evidence, we would be unable to conclude that the error resulted in reversible harm. The erroneous admission of evidence is non-constitutional error. *Sandoval v. State*, 409 S.W.3d 259, 287 (Tex. App.—Austin 2013, no pet.). For non-constitutional errors, reviewing courts should only reverse the conviction if the error affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas v. State*, 505 S.W.3d 919, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). As discussed above, the evidence adduced about Gutierrez's shooting Gonzalez and its effects on Gonzalez, his family, and the larger community supported the sentence given. We find no indication in the record that the jury was swayed to give a harsher sentence in this case because of this evidence concerning Gutierrez's previous bad acts. We overrule ground three.

## CONCLUSION

Having overruled all three grounds for error presented, we affirm the judgment.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   August 31, 2023

Do Not Publish

19